420 A.2d 603

**Eugene L. MARINELLI, Administrator of the Estate of Eugene R. Marinelli, Deceased,**

v.

**The MONTOUR RAILROAD COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 14, 1979.

Filed June 6, 1980.

Reargument Denied Oct. 16, 1980.

Petition for Allowance of Appeal Denied Feb. 17, 1981.

Raymond G. Hasley, Pittsburgh, for appellant.

Sanford S. Finder, Washington, for appellee.

Before SPAETH, HOFFMAN and VAN der VOORT, JJ.

SPAETH, Judge:

Appellee, as administrator of the estate of his deceased son, Eugene R. Marinelli, commenced wrongful death and survival actions against appellant, Montour Railroad. Following a non–jury trial, the lower court rendered a verdict in favor of appellee in both actions. Montour's exceptions to the verdict were subsequently dismissed. On appeal, Montour argues that judgment notwithstanding the verdict should be entered in its favor for any of several reasons: appellee failed to prove that it was negligent; if it was negligent, appellee failed to prove that its negligence was the proximate cause of Marinelli's death; Marinelli's death resulted from his voluntary assumption of a known risk; and Marinelli was contributorily negligent as a matter of law. Montour also argues that the damages awarded by the lower court were unsupported by the evidence and hence excessive.

### –Montour's Negligence–

In considering whether judgment n. o. v. should be entered in favor of Montour, we must view the evidence, including all reasonable inferences arising from it, in the light most favorable to appellee, the verdict–winner. *Miller v. Checker Yellow Cab Co.*, 465 Pa. 82, 348 A.2d 128 (1975); *Estate of Flickinger v. Ritsky*, 452 Pa. 69, 305 A.2d 40 (1973); *Kresovich v. Fitzsimmons*, 439 Pa. 10, 264 A.2d 585 (1970). So viewed, the evidence discloses the following.

During the summer of 1973, Eugene Marinelli, a sophomore at the University of West Virginia, was employed as a laborer by Cecil Township in Washington County. On July 25, he was working with a Township roadcrew on Burnside Road. Shortly before 2:30 p. m., Marinelli was instructed by his supervisor to board a Township dump truck and go with three other crew members–Angelo Quaresima, Ernest Davis, and Robert Soma–to another work site. Since the cab of the truck was designed to carry no more than three persons, Soma and Marinelli climbed into the back of the truck after

Quaresima and Davis entered the cab. The truck was 8 feet 6 inches high, and was loaded with two and a half tons of stones–about half a truck load. On top of the stones were pitchforks, picks, and shovels. Because the stones were uncomfortable to sit on, and also because the tools presented a hazard, Soma and Marinelli seated themselves on the cab protector. The cab protector was a steel covering that was connected to the bed of the truck and extended over the top of the cab. Its purpose was to protect the cab from falling objects during dumping operations, but it provided Soma and Marinelli a convenient place to sit.

To get to the work destination, Quaresima drove the truck along Papp Road, which was owned and maintained by the Township. At one point the road crossed under a railroad bridge owned and maintained by Montour. The vertical clearance of this underpass was not marked, but Quaresima knew from prior experience that the dump truck could pass safely through. Quaresima, however, did not know, because he had not been told, that Soma and Marinelli were sitting on the cab protector. Moreover, Soma and Marinelli were seated on the cab protector facing the back of the truck and were oblivious to the existence of the bridge and underpass. Had either of them turned and looked forward, he would have seen the bridge and the underpass from a distance of 500 to 600 feet; but neither looked. When the accident occurred, the dump truck was traveling approximately 20 to 25 miles per hour, and Soma and Marinelli were hunched on the cab protector with their heads between their knees. They were seated in this way because several minutes earlier, while they had been sitting in an upright position, Soma's eyeglasses had been knocked from his head to the bed of the truck by an overhanging tree limb. Soma and Marinelli thought that by hunching over they would prevent a future mishap. Soma did not strike the bridge as the truck passed through the underpass, and escaped injury. Marinelli was killed instantaneously when the back of his head struck the bridge. When asked why Marinelli struck the bridge and he did not, Soma stated that because he was tall and thin, he

was bending lower than Marinelli, who was shorter and stockier. No part of the truck hit the bridge, and had Marinelli been sitting in the truck bed on the stones, he would have also passed through the underpass safely.

Montour built the bridge in late 1913 and early 1914. When it was built, the vertical clearance between the road and the underside of the bridge was 14 feet. After the accident, Montour excavated about the piers supporting the bridge girders and discovered evidence indicating that the bridge was still 14 feet above the 1914 level of the roadbed. At the time of the accident, however, the vertical clearance was only 10 feet 2 inches. The reduction in the clearance evidently had resulted primarily, if not entirely, from the numerous repairs made to the road by the Township during the 59 years from 1914 to 1973. When the road needed repairing, the Township would repave it without removing the old surface. Road building materials thus accumulated to such an extent that several weeks before the accident the vertical clearance had been reduced to 8 feet. When school buses and maintenance equipment could no longer travel along the road because of the obstructed underpass, the Township increased the clearance to 10 feet 2 inches by reducing the level of the road bed. It was undisputed that since 1914, Montour had never inspected the vertical clearance underneath its bridge, and had made no attempt either itself to maintain the original 14 foot clearance or to persuade the Township to maintain the clearance. Furthermore, an inspection by Montour would have disclosed that the vertical clearance had been substantially less than 14 feet for a substantial period of time.

It is the well–established policy of this Commonwealth that a railroad company is required to maintain crossings of its railways with public highways[1] that are safe for travelers upon the highways. *Geelen v. Pennsylvania Railroad Co.*, 400 Pa. 240, 161 A.2d 595 (1960); *Pro v. Pennsylvania Railroad Co.*, 390 Pa. 437, 135 A.2d 920 (1957);

---

1. There is no question that Papp Road was a public highway. *See* 66 Pa.C.S.A. § 102 (1979).

*P., F.W. & C. Railway Co. v. Dunn*, 56 Pa. 280 (1867). Thus, since the time when railroads were introduced in the Commonwealth it has been a criminal offense for a railroad to obstruct the passage of any crossing of a public highway, Act of March 20, 1845, P.L. 191 (repealed and substantially re–enacted at 18 Pa.C.S.A. § 6907 (1973)); *Commonwealth v. P., H. & P. R.R. Co.*, 33 Pa.Super. 452 (1907), and an identical duty was created under civil law, Act of Feb. 19, 1849, P.L. 79, § 12, 15 P.S. § 4101, *repealed by* the Act of July 1, 1978, P.L. 598, No. 116, § 2. Moreover, a railroad's responsibility does not cease at the point where it refrains from affirmatively creating an unsafe crossing. "The public is entitled to have crossing facilities continuously maintained in a safe condition," *Scott Township v. Pa.P.U.C.*, 188 Pa.Super. 174, 179, 146 A.2d 617, 619 (1958), and when a crossing becomes unsafe, for whatever reason, a railroad may be ordered, at its own expense, to alter or abolish the crossing. 66 Pa.C.S.A. § 2702(c), (f) (1979). This is true even though the crossing was safe at the time of construction and has become unsafe only because of events that were beyond the railroad's control. *E. g., Erie R.R. v. Public Service Commission*, 271 Pa. 409, 114 A. 357 (1921); *Pa.P.U.C. v. Septa*, 21 Pa.Cmwlth. 106, 343 A.2d 371 (1975); *Allegheny Cty. Port Auth. v. Pa. P.U.C.*, 207 Pa.Super. 299, 217 A.2d 810 (1966); *Lehigh & New England R.R. v. Public Service Commission*, 126 Pa.Super. 565, 191 A. 380 (1937).

When a crossing is accomplished by building a railroad bridge over the grade of a public highway, the railroad's duty to maintain a safe crossing includes the duty to build its bridge so " 'as to afford reasonably sufficient clearance or headway for ordinary vehicular traffic.' " *Illinois Central Railroad Co. v. Farris*, 259 F.2d 445, 447 (5th Cir. 1958) (WISDOM, J.) (footnote and citation omitted). If a railroad breaches this duty by maintaining a bridge with an insufficient clearance, it will be liable for the injuries that result from its negligence. *Ryan v. St. Johnsbury & Lamoille Cty. R.R.*, 290 F.2d 350 (2d Cir. 1961); *Norfolk Southern Ry. Co. v. Davis Frozen Foods*, 195 F.2d 662 (4th

Cir. 1952); *Contino v. Baltimore & Annapolis R. Co.*, 178 F.2d 521 (4th Cir. 1949), *cert. denied*, 341 U.S. 927 (1951); *Wittrup v. C. & N.W. Railway Co.*, Iowa, 226 N.W.2d 822 (1975); *Benson v. Loehler*, 228 Md. 55, 178 A.2d 909 (1962); *Yackee v. Village of Napoleon*, 135 Ohio St. 344, 21 N.E.2d 111 (1939); *Krause v. Southern Pac. Co.*, 135 Or. 310, 295 P. 966 (1931).

In claiming that Montour breached its duty to maintain a safe crossing across Papp Road, appellee relies heavily on the Act of June 10, 1911, P.L. 867, § 1, 15 P.S. § 4116, *repealed by* the Act of July 1, 1978, P.L. 598, No. 116, § 2 (eff. Aug. 9, 1978). This statute provided:

> In all cases where the railroad tracks of any company shall, for the purpose of avoiding or eliminating grade crossings, be so constructed as to cross any public highway above grade, by means of a bridge, viaduct, or any other structure, the abutments, piers, or other supports of such bridge shall be so built as to maintain a minimum width on said highway of twenty–four feet in the clear, and so as to maintain a minimum height of fourteen feet in the clear . . . .

Appellee contends that this statute required Montour to build and maintain its bridge with a 14 foot clearance, and that its failure to do so was negligence per se. Montour, on the other hand, contends that the statute only required it to build its bridge 14 feet above Papp Road, and that when it did this in 1914, it discharged its duty to the traveling public, and the Township's subsequent obstruction of the clearance after 1914 did not impose upon it the duty of removing the obstruction. These conflicting contentions raise a nice problem of statutory construction.

The wording of the statute does not explicitly place upon railroads the duty of maintaining their bridges at public crossings with a clearance of fourteen feet, *i. e.*, the statute does not state, "Railroads shall maintain their bridges with a clearance of 14 feet." The subject of the statute is "abutments, piers, or other supports," the verb is "shall be built," and the phrase "so as to maintain a minimum height of

fourteen feet in the clear" is adverbial, describing how the abutments, piers, and supports are to be built. Thus, the statute may reasonably be read as requiring only that railroads build bridges that have a fourteen foot clearance at the time of construction and are structurally capable of maintaining a fourteen foot clearance thereafter (*i. e.*, bridges that will not sag or the supports of which will not sink into the ground). Under this reading, a railroad would not be responsible when a clearance under its bridge is diminished subsequent to construction by causes unrelated to structural weaknesses or defects in the bridge.

The statute, however, may also reasonably be read as requiring that a railroad bridge crossing a public highway shall at any given time, and not just at the time of original construction, be so constructed that a fourteen foot clearance is maintained. Thus it might be said that although the legislature's grammar is somewhat loose, still, the legislature must have intended to impose a duty greater than merely a duty to build bridges with a stated clearance, or else the legislature would not have referred to "maintain[ing]" the bridges.

Which of the above readings reflects the legislature's intent is a matter of speculation. No legislative history regarding the statute survives, although several cases decided before the statute indicate that it was enacted to resolve continuing controversies between railroads and local authorities regarding the placement of bridge supports within the limits of public highways. *Schwenk v. Pennsylvania Schuylkill Valley R. R. Co.*, 2 Chest.Reps. 177 (1883); *Chester Township Supervisors v. Baltimore & Philadelphia R. R. Co.*, 3 Del.Reps. 151 (1887); *Chestnut Hill & Springhouse Turnpike Road Co. v. Pennsylvania R. R. Co.*, 6 Montg.Regs. 121 (1890); *Upper Darby Township v. Philadelphia & Western R. R. Co.*, 9 Del.Reps. 567 (1905).

This much, however, is clear: The statute reflects a legislative judgment as to the clearance that is reasonable whenever a railroad bridge crosses a public highway outside

a city or borough.[2]   Since the statute reflects a legislative judgment as to what constitutes reasonable clearance, the statute was properly considered by the lower court as evidence that the clearance of Montour's bridge over Papp Road was unreasonably low.[3]   *Compare Skoda v. W. Penn Power Co.*, 411 Pa. 323, 191 A.2d 822 (1963) (evidence that electric company's minimum wire clearance specifications required 22 foot clearance between ground and overhanging wires was sufficient evidence that electric company was negligent in maintaining wires only 20 to 21 feet above ground).   Furthermore, given this evidence, the lower court was entitled to find that Montour was negligent in failing to take any action, from 1914 to 1973, to maintain a reasonable clearance.   For regardless of whether Montour was required under section 4116 to maintain a 14 foot clearance, it was required at common law to maintain a safe crossing, and as just noted, the lower court was entitled to find that a vertical clearance of less than 14 feet was unsafe.

Montour complains that it should not be deemed responsible for an obstruction of the crossing that was created entirely by the Township on property that the Township owned and controlled.   Because it had no right to enter upon Papp Road and excavate its surface so as to restore the original 14 foot clearance, Montour argues that it was inequitable for the lower court to hold it liable for Marinelli's death.   It has been held, however, that public authorities responsible for making public highways safe for travel have the duty to abate dangerous conditions existing on private lands abutting the highways.   *Lengle v. North Lebanon Township*, 274 Pa. 51, 117 A. 403 (1922).   In *Lengle*

2.   15 P.S. § 4117 (1967), *repealed by* the Act of July 1, 1978, P.L. 598, No. 116, § 2, states that the minimum clearances set forth in section 4116 shall not apply to crossings in cities and boroughs.

3.   That section 4116 had been repealed by the Legislature four days prior to the trial in this case did not affect the relevancy of the statute as evidence of what the Legislature thought was a reasonable clearance in 1973 when the accident occurred.   It may also be noted that the repeal of section 4116 was not effective until 56 days after Montour's trial.

the authorities in question were township supervisors who had failed to require a private lane to be filled or otherwise repaired so that its intersection with a township road would be safe. However, we find no reason in principle to distinguish between the duty of municipal authorities to abate dangerous conditions on land not owned by the municipality, and the duty of a railroad to abate dangerous conditions on land not owned by the railroad, where the site in question is a public railroad crossing.[4]

This rule is not so harsh as may seem. Thus, to eliminate the dangerous condition here, Montour was not necessarily constrained to raise its bridge. It could have filed a complaint with the Township, and if that brought no relief, administrative remedies were available, which could have been initiated by filing a complaint with the public utility commission alleging the dangerousness of the crossing and requesting that the Township be ordered by the commission to maintain its road properly. *See generally Borough of Plateau v. Commonwealth*, 14 Pa.Cmwlth. 478, 322 A.2d 780 (1974); *Township of Swatara v. Commonwealth, Pa. P. U. C.*, 11 Pa.Cmwlth. 196, 312 A.2d 809 (1973); *City of Arnold v. Pa. P. U. C.*, 192 Pa.Super. 476, 162 A.2d 77 (1960); *Scott Township v. Pa. P. U. C., supra.* Instead, for 59 years Montour did nothing, even though, whenever a railroad built a bridge across a public highway, a clearance of 14 feet had been statutorily required since passage of the Act of June 10, 1911, *supra.* This requirement was "enough to indicate the danger of a lower clearance to any one . . . ." *Contino v. Baltimore & Annapolis R. Co.*, 178 F.2d at 523.

■ We do not say that a railroad's duty to abate dangerous conditions is absolute. It may be that in another case the railroad could show that its efforts to abate had been so diligent that it should be held to have satisfied its duty. However, no such resource is available to Montour. Not

4. We realize that some courts have held to the contrary, but we do not find their reasoning persuasive. *See, e. g., Carr v. Chicago & Northwestern Ry. Co.*, 333 Ill.App. 567, 77 N.E.2d 857 (1948); *Shedd v. Pollard*, 55 Ga.App. 828, 191 S.E. 492 (1937).

only did it never seek to require the Township to restore the clearance under the bridge to a reasonably safe clearance, but it never even inspected the clearance. The Township's obstruction of the clearance was not sudden; it occurred over a substantial period of time, as repeated repairs to the road were made. Had Montour inspected the clearance, it would have learned that as much as 6 feet, or 40%, of the original clearance had become blocked. Moreover, Montour had at least constructive notice that vehicles as high as 13 feet 6 inches could legally travel along Papp Road. 75 Pa.C.S.A. § 4922(a) (1977).[5] It therefore could have reasonably foreseen that a vehicle higher than the clearance provided by the underpass might be driven into the bridge and an innocent person in the vehicle hurt as a result. Since Montour thus had reason to foresee the harm that in fact occurred as a result of its negligence, it is responsible for that harm. The somewhat unusual facts of this case, where the vehicle passed through the underpass safely but a passenger on top of the vehicle struck the bridge, does not absolve Montour. Though the facts may be unusual, the harm proceeded from a risk or hazard that was foreseeable. *E. g., Noon v. Knavel,* 234 Pa.Super. 198, 339 A.2d 545 (1975).

-Proximate Cause-

██ We also reject Montour's argument that appellee failed to prove that its negligence was the proximate cause of Marinelli's death. It cannot be doubted that the lower court was entitled to find that Montour's maintenance of the low bridge was a substantial factor causing Marinelli's death. *See Ross v. Vereb,* 481 Pa. 446, 392 A.2d 1376 (1978);

5. The fact that 75 Pa.C.S.A. § 4922(a) does not require public authorities to provide sufficient vertical clearance to permit the operation of vehicles 13 feet 6 inches high does not prove Montour's non–negligence in maintaining a bridge 10 feet 2 inches high. *But see Brelo v. New York Central R. R . Co.,* 112 Ohio App. 145, 168 N.E.2d 609 (1960). An act statutorily permitted may nevertheless be negligent in the particular circumstances of a case. *See Nelson v. Duquesne L. Co.,* 338 Pa. 37, 12 A.2d 299 (1940); *cf. St. Clair v. B & L Paving Co.,* 270 Pa.Super. 277, 411 A.2d 525 (1979).

*Miller v. Checker Yellow Cab Co., supra; Pegg v. General Motor Corp.*, 258 Pa.Super. 59, 391 A.2d 1074 (1978); Restatement (Second) Torts § 431 (1965). Moreover, Montour's negligence was not superseded, as it claims, by the negligence of other persons—*i. e.*, the township (for raising the level of the road), Quaresima (for driving the dump truck without knowing Marinelli's position), and Marinelli's supervisor (for not instructing Marinelli where to sit in the truck). "An intervening negligent act will not be a superseding cause relieving the original negligent actor from liability *if* that actor at the time of his negligent act *should have realized* that another person's negligence might cause harm; or, if *a reasonable man* would not regard the occurrence of the intervening negligence as *highly extraordinary*; or, if the intervening act is not *extraordinarily negligent.* What the original actor should have realized and what a reasonable man would say was highly extraordinary are, of course, fact questions which must in the majority of cases be left to the jury." *Estate of Flickinger v. Ritsky*, 452 Pa. at 75, 305 A.2d at 43 (original emphasis). *See also* Restatement (Second) Torts § 447 (1965). Thus, even were we to grant Montour's argument that the Township, Quaresima, and Marinelli's supervisor acted negligently, we could not say as a matter of law that the lower court had to find that their negligence was so extraordinary that it could not have been foreseen by Montour. Indeed, the negligence of the township could not be a superseding cause of the accident since it occurred before, or simultaneously with, Montour's negligence. Furthermore, the possibility that other tortfeasors were responsible for the accident does not exonerate Montour. At best Montour's liability would be joint and several with that of those other tortfeasors. Appellee, however, was not constrained to join all tortfeasors in his suit against Montour. *Coyne v. Pittsburgh Rys. Co.*, 393 Pa. 326, 141 A.2d 830 (1958); *Gates v. Pennsylvania Railroad Co.*, 150 Pa. 50, 24 A. 638 (1892); Restatement (Second) Torts §§ 433A, 433B (1965).

## –Voluntary Assumption of Risk–

We also reject Montour's argument that Marinelli, by sitting on the cab protector, assumed the risk that he would be struck by Montour's bridge, for there was no evidence that Marinelli knew that the bridge existed. "Assumption of the risk as a defense requires a demonstration that, in fact, plaintiff knew of the danger created by defendant's negligence and explicitly or implicitly accepted the risks created by this negligence." *Jones v. Three Rivers Management Corp.*, 483 Pa. 75, 394 A.2d 546, 552–53 (1978); Restatement (Second) Torts §§ 496 A–G (1965).

## –Contributory Negligence–

We also reject Montour's argument that Marinelli was contributorily negligent as a matter of law. It is well–settled that contributory negligence will be declared as a matter of law only where it is so clear that there is no room for fair and reasonable disagreement as to its existence. *Skoda v. W. Penn Power Co., supra; Jewell v. Beckstine*, 255 Pa.Super. 238, 386 A.2d 597 (1978); *Westerman v. Stout*, 232 Pa.Super. 195, 335 A.2d 741 (1975). While the issue is close, we believe the lower court was entitled to find that Marinelli reasonably refrained from sitting in the bed of the truck because of the dangerous tools that were lying on the stones. Furthermore, the court could find that Marinelli seated himself on the cab protector in such a way as to minimize the chance that he would be knocked off, and also, that for him to have attempted to sit straight and look over his shoulder to see what lay ahead would have been a more precarious endeavor than for him to remain, as he did, hunched with his head between his knees.

It is true that the Supreme Court has stated that "[w]here one uses a motor vehicle on the highway ... with any projection extending beyond the lines of the car, he will be presumed to apprehend any danger that may come from the ordinary movement of the vehicle, the trailer and any projections, and will be responsible for any injury occasioned thereby." *Dorris v. Bridgman & Co.*, 296 Pa. 198, 203, 145 A.

827, 829 (1929). *Accord: Phoenix Ins. Co. v. McDermott Bros. Co.*, 416 Pa. 569, 208 A.2d 245 (1965). This principle, however, was stated in a case where a truck driver approached a known danger with a load that extended beyond the lines of his truck and yet failed to exercise due care to avoid an accident. Here, Marinelli, not knowing about the bridge, nevertheless took the precaution of minimizing his exposure above the truck. Although Marinelli did not tell Quaresima where he was sitting, as he might have, it was not beyond the fact–finder's prerogative to find that Marinelli had cause to believe that on a road such as Papp Road, stationary objects would not be erected over the roadway as low as Montour's bridge. *See Benson v. Loehler, supra; Kraus v. Southern Pac. Co., supra.* In some cases the courts and legislature have recognized that riding on the outside of a vehicle may constitute contributory negligence as a matter of law. *D'Ambrosio v. Philadelphia*, 354 Pa. 403, 47 A.2d 256 (1946); 75 Pa.C.S.A. § 3711(a) (1977). This recognition, however, has never prevented recovery in an appropriate case. *See DiGiuseppe v. Krivnak*, 359 Pa. 408, 59 A.2d 164 (1948); *Srednick v. Sylak*, 343 Pa. 486, 23 A.2d 333 (1941); *Harris v. Seiavitch*, 336 Pa. 294, 9 A.2d 375 (1939).

–Damages–

The lower court awarded appellee $25,200 in the survival action. Contrary to Montour's assertion, these damages were supported by the evidence and were not excessive. At the time of his death, Marinelli was eighteen years old, in good health, and a sophomore at the University of West Virginia, where he was studying towards a degree in pharmacology. In high school, Marinelli had been a National Honor student and president of a student organization. His grades during his freshman year in college were likewise good. He was thrifty and a steady worker; he had been working at least part–time since he was in grade school, when he carried a paper route.

Our courts have recognized the difficulty in computing the future earning capacity of someone who has not yet begun a career. This difficulty, however, does not place one

who has been injured "without the protection of the law, so that compensation for the damage resulting from negligent acts cannot be allowed merely because facts are not, by the evidence, reduced to a certainty." *Ginocchi v. Pgh. & L. Erie R. R. Co.*, 283 Pa. 378, 380, 129 A. 323, 324 (1925). Where, as here, the evidence discloses the age, physical and mental conditions, and habits of the injured person, a determination of future earning capacity may be made by the fact–finder in reliance upon the knowledge and common sense acquired through the experiences of life. *Hankins v. Mack*, 364 Pa. 417, 72 A.2d 268 (1950); *Slavin v. Gardner*, 274 Pa.Super. 192, 418 A.2d 361 (1979); *Prince v. Adams*, 229 Pa.Super. 150, 324 A.2d 358 (1974). Given Marinelli's academic performance, his health, and his personal characteristics, the lower court's award was well within the maximum that could have been awarded in the survival action. *Compare Slavin v. Gardner, supra.*

We agree with Montour, however, that the damages awarded in the wrongful death action were excessive. The lower court awarded appellee $1,538.60 to cover the cost of his son's funeral, and $2,000 for the expense of administering his son's estate. The funeral expenses were proved at trial; no evidence, however, was introduced as to the administration expenses. In *Fidelity–Phila. Trust Co. v. Staats*, 358 Pa. 344, 349, 57 A.2d 830 (1948), the Supreme Court held that the administration expenses recoverable in a wrongful death action include "only the cost of obtaining letters testamentary or of administration in order to qualify the plaintiff for the purpose of bringing suit. The term 'expenses of administration' is employed [in 42 Pa.C.S.A. § 8301(c)–the provision authorizing recovery of administration expenses in a wrongful death action] in conjunction with hospital, nursing, medical and funeral expenses, and it would seem clear that all these items are intended to cover only such expenses as are *immediately* attendant upon, and related to, the decedent's injuries and death." While the lower court might have been able to take judicial notice of the cost of obtaining letters of administration in Washington

County, there is no indication that the damages awarded to appellee resulted from such judicial notice. Indeed, the size of the award indicates otherwise. In these circumstances, the award for administration expenses must be stricken. We shall therefore exercise our power to mould the lower court's verdict by reducing appellee's award in the wrongful death action by $2,000. *Thompson v. Philadelphia*, 222 Pa. Super. 417, 294 A.2d 826 (1972); *Gaspero v. Gentile*, 160 Pa.Super. 276, 50 A.2d 754 (1947).

The order of the lower court is modified and affirmed in accordance with this opinion.