717 A.2d 309 (1998)
Sarah L. BROWN, Appellant,
v.
CONSOLIDATED RAIL CORPORATION, Appellee.
No. 97-CV-5.
District of Columbia Court of Appeals.
Argued May 19, 1998.
Decided August 20, 1998.
*310 Jack A. Gold, with whom Lawrence S. Lapidus, Bethesda, MD, was on the brief, for appellant.
James B. Sarsfield, Washington, DC, for appellee.
Before TERRY, SCHWELB and RUIZ, Associate Judges.
Schwelb, Associate Judge:
On April 8, 1994, according to her complaint, Sarah L. Brown was injured when a metal object fell through the windshield of her car as she passed eastbound through the underpass of the East Capitol Street railroad bridge. Ms. Brown commenced this negligence action against Consolidated Rail Corporation (Conrail), which operates trains on railroad tracks that run perpendicular to East Capitol Street on the ground above the underpass. The trial judge granted Conrail's motion for summary judgment, concluding that "[Ms. Brown] cannot establish that [Conrail] had a duty to her which it breached, for the reasons stated in [Conrail's] motion and reply."
Ms. Brown argues on appeal, as she did before the trial judge, that Conrail had a duty of care which flowed from each of three alternate sources: (1) a statutory duty to maintain railroad bridge underpasses, pursuant to D.C.Code § 7-1414(b) (1995); (2) a common law duty as a railroad to inspect and maintain its crossings; and (3) a common law duty as a landowner to use reasonable care to protect passers-by on adjoining public land. We disagree with Ms. Brown's statutory argument, but conclude that genuine issues of material fact exist with respect to each of her common law theories.

*311 I.

FACTS
Ms. Brown contends that the metal object which allegedly injured her, identified as a "railroad tie plate,"[1] fell through one of four "bridge vents," which are essentially air shafts that run from the ceiling of the underpass to the surface above, where the tracks lie. According to Conrail, each rectangular bridge vent measures eighty-three feet by one foot, and the long end of each vent spans the full width of the highway below. As an eastbound car passes through the underpass, it travels under overhead vents at irregular intervals along the 300 foot tunnel: the first vent is located at 65 feet, the second at 136 feet, the third at 208 feet, and the fourth at 235 feet. Conrail's tracks run between the fourth bridge vent and the tunnel's east-bound exit. According to Ms. Brown's deposition testimony, she was two to three car lengths inside the tunnel when the piece of metal struck her windshield. Ms. Brown was unable to state, however, which of the four vents was involved.
On the surface above the underpass, the bridge vents are covered with wire mesh. The parties appear to agree that, at the relevant time, the wire mesh on at least some of the bridge vents was in a state of disrepair.
The parties disagree as to the nature and extent of Conrail's property interest in the East Capitol Street bridge. Conrail's corporate designee, Wayne Lukaszuk, testified at his deposition that Conrail owns all of the land that runs atop the underpass except for the bridge vents. Notwithstanding Lukaszuk's testimony, Conrail contends that any interest it has in the bridge and its surrounding property is quite limited, because the preceding landowners dedicated the property to the District of Columbia for the purpose of building the bridge. Conrail therefore claims that when it obtained the property, it received only a right of way over the bridge; the maintenance of the land surrounding the bridge and the bridge itself, including the bridge vents, was the District's responsibility.[2]

II.

STANDARD OF REVIEW
To prevail on its motion for summary judgment, Conrail "must demonstrate that there is no genuine issue of material fact and that [it is] entitled to judgment as a matter of law." Hendel v. World Plan Executive Council, 705 A.2d 656, 660 (D.C.1997); see Super Ct.Civ.R. 56(c); Colbert v. Georgetown Univ., 641 A.2d 469, 472 (D.C.1994) (en banc). The evidence must be viewed in the light most favorable to Ms. Brown, and all reasonable inferences must be drawn in her favor. See Hendel, supra, 705 A.2d at 660; Beard v. Goodyear Tire & Rubber Co., 587 A.2d 195, 198 (D.C.1991). "Once the movant has made an initial showing that there is no genuine issue of material fact, the non-moving party then has the burden to show that an issue does exist." Claytor v. Owens-Corning Fiberglas Corp., 662 A.2d 1374, 1381 (D.C.1995). In this regard, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Bolle v. Hume, 619 A.2d 1192, 1194 (D.C. 1993) (per curiam) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
In reviewing an order granting summary judgment, "this court conducts an independent review of the record and applies the same standard used by the trial court." Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624, 626 (D.C.1997).

III.

THE DUTY OF CARE
"It is a familiar principle that a person is liable to another in negligence only if it *312 can be shown that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff." Haynesworth v. D.H. Stevens Co., 645 A.2d 1095, 1097-98 (D.C.1994). The trial judge granted summary judgment in Conrail's favor on the ground that Conrail owed no duty of care to Ms. Brown. Ms. Brown claims, to the contrary, that such a duty of care existed and that it was grounded in three separate sources. We examine each source in turn.

A. Conrail's statutory duty.

Ms. Brown first asserts that Conrail owed her a statutory duty of care pursuant to Public Law No. 84-791, 70 Stat. 638 (1956). As now codified in D.C.Code § 7-1414(b), Public Law No. 84-791 provides in part:
(b) The cost and expense of any project for opening any such street or highway within the limits of such railroad company's right-of-way, including the cost of constructing the portion of any viaduct bridge, within said limits, shall be borne and paid as follows:
. . . .
(3) After construction, the cost of maintenance shall be wholly borne and paid in the case of highway overpasses by the District of Columbia, and in the case of highway underpasses by the railroad company, its successors and assigns, whose tracks are crossed....
(Emphasis added.) Because the East Capitol Street bridge is a "highway underpass," Ms. Brown contends that Conrail is responsible for the "cost of maintenance" of the bridge, and that any injury caused by a negligently maintained bridge vent is therefore chargeable to Conrail.
Conrail responds that, notwithstanding the provisions of Public Law No. 84-791, its maintenance responsibility is governed by a Congressional enactment passed six days earlier, Public Law No. 84-731, 70 Stat. 578 (1956). In Public Law No. 84-731, Congress appropriated $665,000 to the District for the specific purpose of constructing the East Capitol Street bridge. Conrail directs our attention to one particular section of this enactment:
SEC. 3. Since the construction of [the] East Capitol Street exten[sion] is to provide connections between the District of Columbia and the Federal Highway System, the entire cost of construction and maintenance of the grade-separation structure referred to in the preceding sections of this Act shall be borne by the District of Columbia, out of funds authorized to be appropriated by this Act and any other funds available to the District, and no contributions to such cost of construction and maintenance shall be required of any railroad whose right-of-way is involved by such structure....
Pub.L. No. 84-731 (emphasis added). Conrail contends that pursuant to this provision, it has no obligation to maintain the East Capitol Street bridge vents, and it therefore owed no duty to Ms. Brown. Ms. Brown responds that Public Law No. 84-791 controls because it is the "last expression of the legislative will."
We agree with Conrail. In interpreting federal statutes, it is a "cardinal rule" that "repeals by implication are not favored." Morton v. Mancari, 417 U.S. 535, 549, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (citations omitted); see also Speyer v. Barry, 588 A.2d 1147, 1164-66 (D.C.1991) (emphasizing need for "steady adherence" to presumption against implied repeals). This important canon of construction must apply with particular force where, as here, the two enactments were separated by only six days, and shared the same legislative track.[3] "When *313 there are two acts upon the same subject, the rule is to give effect to both if possible." Morton, supra, 417 U.S. at 551, 94 S.Ct. 2474 (citation omitted).
In construing these two provisions, we note that Public Law No. 84-791 states a general rule as to railroads' responsibility for bridge maintenance, while Public Law No. 84-731 applies only to one specific bridge, that which is involved in this case. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." Radzanower v. Touche Ross & Co., 426 U.S. 148, 153, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976) (quoting Morton, supra, 417 U.S. at 550-51, 94 S.Ct. 2474); accord, Speyer, supra, 588 A.2d at 1164 n. 28. Public Law No. 84-791 controls as the general rule with respect to railroads' maintenance obligations of railroad-highway grade separations, while Public Law No. 84-731 operates as a specifically-carved exception to that general rule. The specific exception controls this case.
A review of the pertinent legislative history supports our conclusion. The Committee Reports of the Senate and House of Representatives both state that the District initially proposed the assessment of 50% of the East Capitol Street bridge project's cost against the railroads. H.R.Rep. No. 84-2609, at 2 (1956); S.Rep. No. 84-2246, at 2 (1956). The Committees rejected this proposal, noting that the project would be "of no benefit whatever to the railroads," that it would "probably result in loss of business" for them, and that it would advance the federal interest. Id. Though the Committee Reports make no reference to the provision that would become Public Law No. 84-791, Congress evidently believed that the policies which might normally call for financial contributions on the part of the railroads had no application in the context of the East Capitol Street grade separation project.[4]

B. Conrail's common law duty as a railroad.

Ms. Brown next asserts that even if the trial judge correctly decided the statutory question, Conrail had common law obligations to persons in her situation; these obligations, according to Ms. Brown, were unaffected by the enactment of Public Law No. 84-731.[5] One such duty, according to Ms. Brown, arises from Conrail's status as a railroad.
"[I]t is the duty of every railroad company properly to construct and maintain crossings over all highways on its line in such *314 a manner that they shall be safe and convenient to travelers so far as it may be done without interfering with the safe operation of the road...." Contino v. Baltimore & Annapolis R.R. Co., 178 F.2d 521, 524 (4th Cir.1949) (Contino I); see Harris v. Southern Ry. Co., 100 N.C.App. 373, 396 S.E.2d 623, 626 (1990); Marinelli v. Montour R.R. Co., 278 Pa.Super. 403, 420 A.2d 603, 606 (1980); Whitby v. Baltimore C. & A. Ry. Co., 96 Md. 700, 54 A. 674, 676 (1903); 65 AM. JUR.2D Railroads §§ 270, 482 (1972). This, at least, is the applicable rule in situations where the initial crossing construction and maintenance responsibilities were assumed by the railroad, see Contino I, supra, 178 F.2d at 524, or by its predecessor in interest. See Baltimore & Annapolis R.R. Co. v. Contino, 185 F.2d 932, 933 (4th Cir.1950), cert. denied, 341 U.S. 927, 71 S.Ct. 798, 95 L.Ed. 1358 (1951) (Contino II) (duty to maintain bridges and underpasses extends to successor railroads); 65 AM.JUR.2D Railroads § 482 (same). However,
the situation is modified when existing lines are crossed by new highways established by government authority. Nevertheless a railroad is not relieved of all responsibility even in such a case. It must adjust itself to new conditions and new facilities provided in the public interest and may not ignore the dangers incident to its own use of the crossing merely because it was the first on the ground.
Contino I, supra, 178 F.2d at 524.
Applying these principles, we note at the outset that Conrail's duty to maintain its crossings cannot extend as far as did the railroad's duty in Contino. In Contino I, a 12' truck struck an overhead railroad bridge with a clearance of only 10' 10". 178 F.2d at 522-23. The applicable Maryland statute required a clearance of 14'. Id. at 523. The railroad defended largely on the ground that a Maryland governmental agency had erected and maintained the crossing at its own expense. Id. The trial court agreed and dismissed the action. Id. at 522. In reinstating the plaintiff's complaint, the appellate court observed that the railroad had objected to the government's original construction plan, which was later abandoned, but had contributed funds toward a revised plan. Id. at 525. The revised plan was "submitted to and approved by" the railroad's engineer, and was put into effect. Id. The court ruled that the railroad had thus become part of a "joint enterprise" in the creation of a dangerous structural defect, and that it therefore shared responsibility for its consequences. Id. In the present case, however, Ms. Brown has made no such showing of participation or involvement by Conrail or by its predecessor in interest.
Nevertheless, when the District constructed the underpass, the railroad was required to "adjust itself," id. at 524, to the change in circumstances, even though it bore no financial responsibility for the bridge itself. This is the minimum, or "modified" duty to maintain railroad crossings recognized in Contino I. Id. This "modified" duty is not a general duty to maintain; rather, it extends only to the avoidance of unreasonable risks caused by Conrail's activities. The District's statutorily-imposed duty to maintain the bridge does not entitle Conrail to "ignore the dangers incident to its own use of the crossing." Id. If Conrail's activities on the East Capitol Street crossing subjected highway passersby to an unreasonable risk of harm, then Conrail was obliged to take reasonable precautions to guard against such a danger. Public Law No. 84-731 does not absolve Conrail of this burden. See note 5, supra.
We cannot determine conclusively, on the basis of this record, whether Conrail has fulfilled this modified duty, for the parties have focused only on the question whether such a duty exists, and not on whether Conrail carried it out. We note that it is incumbent upon Conrail, in the first instance, to demonstrate the absence of a genuine issue of material fact. See Claytor, supra, 662 A.2d at 1381; Super. Ct. Civ. R. 56(c). We conclude that Conrail has not met this threshold burden.

C. Conrail's duty as a possessor of land.

The second common law duty that Ms. Brown seeks to ascribe to Conrail arises out of Conrail's status as a possessor of land. Specifically, Ms. Brown contends that Conrail was in possession of the land above the *315 underpass, and it therefore had "a duty to use reasonable care to protect passers-by on adjoining public ways." Husovsky v. United States, 191 U.S.App.D.C. 242, 250, 590 F.2d 944, 952 (1978). This duty, according to Ms. Brown, required Conrail to protect her from unreasonably dangerous conditions on its land, such as damaged bridge vents.[6] Ms. Brown relies, inter alia, on the RESTATEMENT (SECOND) OF TORTS § 364(c) (1965), which provides:
A possessor of land is subject to liability to others outside of the land for physical harm caused by a structure or other artificial condition on the land, which the possessor realizes or should realize will involve an unreasonable risk of such harm, if
. . . .
(c) the condition is created by a third person without the possessor's consent or acquiescence, but reasonable care is not taken to make the condition safe after the possessor knows or should know of it.
Conrail denies that the duties of possessors of land have any application to the present record. Conrail first asserts that, notwithstanding the contrary testimony of its own corporate designee, Mr. Lukaszuk, Conrail neither owns nor possesses the land above the underpass. Conrail relies on a document dated July 14, 1953, entitled "Dedication of Land for Public Highway," in which Conrail's predecessor in interest (Philadelphia, Baltimore and Washington Railroad Company) (PB & W) agreed to "dedicate[][7] to the District of Columbia for highway purposes the part of its right-of-way as shown hereon...." The document contains a diagram which divides the land covering the proposed East Capitol Street underpass into three parcels, one of which is attributed to PB & W. The portion of the PB & W parcel that is directly above the proposed East Capitol Street underpass has apparently been shaded in.[8] This document, according to Conrail, conclusively establishes that Conrail's interest in the land above the underpass was transferred to the District, and it supersedes Mr. Lukaszuk's contrary testimony as a matter of law.
We do not believe that, on this record, we can conclude as a matter of law that Conrail lacks possessory control[9] over the land in question. The diagram on the Dedication of Land does not disclose where the bridge vents lie in relation to the dedicated property, and their location is not otherwise established in the record. We therefore cannot say with certainty whether the damaged vents lie on dedicated land. Moreover, Conrail has not pointed to anything in the record which identifies the owners or occupants of the land on which the bridge vents were located as of April 8, 1994, when the accident occurred. This court cannot simply assume, on the basis of a document executed in 1953, that Conrail had no possessory interest in that property over forty years later. We hold that Mr. Lukaszuk's testimony, coupled with evidence in the record that Conrail periodically inspected the bridge,[10] is sufficient to generate a genuine issue of material fact as to whether Conrail could and did exercise *316 possession and control over the land surrounding the potentially dangerous bridge vents.[11]
Conrail also argues that the rule of law articulated in § 349 of the RESTATEMENT (SECOND) OF TORTS should apply here, rather than the principles set forth in § 364(c). We disagree. Section 349 provides that a possessor of land has no duty to repair or warn of dangerous conditions on adjoining public highways. Thus, if a motorist were to be injured when his car struck a road defect of which an adjoining landowner was aware, the motorist could not successfully maintain a claim against the landowner for failure to warn of or repair that defect. The present case, however, is distinguishable from the factual situations governed by § 349 in two significant respects. First, the condition alleged by Ms. Brown to be dangerous was the bridge vent, and not the highway underneath. Second, if all reasonable inferences are drawn in Ms. Brown's favor, the dangerous condition was actually on land possessed by Conrail, rather than adjacent to it. See RESTATEMENT, supra, § 349 cmt. d ("[t]he rule stated in this Section deals with conditions upon the highway" rather than "conditions created or maintained on the possessor's adjacent land") (emphasis added).
The common law rule relied on by Ms. Brown is well-settled. "[A] landowner should be held to the duty of common prudence in maintaining his property ... in such a way as to prevent injury to his neighbor's property." Dudley v. Meadowbrook, Inc., 166 A.2d 743, 744 (D.C.1961). "A large proportion of the cases have involved danger to an adjacent public highway." KEETON ET AL., supra, § 57, at 388; see, e.g., Husovsky, supra, 191 U.S.App.D.C. at 250-51, 590 F.2d at 952-53. Though Dudley and Husovsky both involved natural conditions (trees falling onto adjacent property), the rule also applies to artificial conditions. See KEETON ET AL., supra, § 57, at 388-89; RESTATEMENT, supra, §§ 364(c), (quoted at pp. 11-12), 365, and 366.
A damaged bridge vent is a "structure or other artificial condition on the land,"[12] and there is a genuine factual dispute as to whether Conrail realized or should have realized that this condition would involve an unreasonable risk of harm. Assuming that Conrail did not acquiesce in the placement of the bridge vent, Conrail is nevertheless subject to liability to Ms. Brown if it failed to exercise reasonable care in making the dangerous condition safe. This is so even though the duty to maintain the bridge vent rests exclusively with the District pursuant to Public Law No. 84-731, see note 5, supra, for, on this record, we cannot say as a matter of law that no other means were reasonably available for Conrail to fulfill its duty.[13]
Finally, we note that this case is different from the typical action alleging liability on the part of owners or possessors of land in that Conrail arguably lacked the authority to remove the offending condition. However, the rule in other jurisdictions appears to be that the liability of a possessor of land is not limited to situations where he or she holds a legal right to remove the artificial condition, so long as other means are reasonably available to avoid or alleviate the danger. See, e.g., Frenkil v. Johnson, 175 Md. 592, 3 A.2d 479, 482-83 (1939); Southern Bell Telephone & Telegraph Co. v. Conyers Toyota, Inc., 190 Ga.App. 792, 380 S.E.2d 296, 298 (1989); Black v. City of Cordele, 163 Ga.App. 322, 293 S.E.2d 557, 559-60 (1982); cf. *317 Schleft v. Board of Educ. of the Los Alamos Public Schools, 109 N.M. 271, 784 P.2d 1014, 1017-18 (1989); Sutton v. Monongahela Power Co., 151 W.Va. 961, 158 S.E.2d 98, 104 (1967); but cf. Hayes v. Malkan, 26 N.Y.2d 295, 310 N.Y.S.2d 281, 258 N.E.2d 695, 696-97 (1970). We decline to depart from this line of authority.

IV.

CONCLUSION
For the foregoing reasons, we agree with Conrail that it had no statutory duty of care vis-a-vis Ms. Brown. We further conclude, however, that summary judgment should not have been granted with respect to Ms. Brown's two common law theories. We therefore reverse the judgment and remand the case for further proceedings consistent with this opinion.
So ordered.
NOTES
[1] According to Conrail, a railroad tie plate is "a flat piece of metal approximately one foot in length used for the purpose of securing rail to a wooden railroad tie."
[2] For reasons unexplained in the record, the District of Columbia was not named as a party to this suit.
[3] The proposal that became Public Law No. 84-731 was referred to the Senate Committee on the District of Columbia on July 30, 1955, and the bill that became Public Law No. 84-791 was referred to the same Committee on January 12, 1956. From that point on, most legislative action on the two bills occurred on the same day, as follows: June 18, 1956 (both bills reported to the Senate by the Committee on the District of Columbia); June 21, 1956 (both bills referred to the House of Representatives Committee on the District of Columbia); July 5, 1956 (both bills reported to the House of Representatives by the Committee on the District of Columbia). Public Law No. 84-731 was enacted on July 19, 1956, and Public Law No. 84-791 was enacted on July 25, 1956.
[4] In her reply brief, Ms. Brown asserts that the two statutes may be read together without invoking implied repeal, in that Public Law No. 84-791 applies to railroads' "successors and assigns," but Public Law No. 84-731 does not. We find this reading implausible. By its own terms, Public Law No. 84-731 applies to "any railroad whose right of way is involved by such structure...." (Emphasis added.) Further, the policies articulated in the Committee Reports would apply to successors in interest just as they would to the railroads then involved.
[5] Conrail suggests in passing, and without citation of authority, that it owes no common law duty of care in light of Congress' decree that the cost of the East Capitol Street bridge's maintenance is to be borne exclusively by the District. We construe Conrail's oblique reference as an argument that Public Law No. 84-731 preempted its common law duties. See generally Cipollone v. Liggett Group, Inc., 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985).

Assuming, arguendo, that Conrail has adequately raised this issue, we conclude that Congress, in enacting Public Law No. 84-731, intended to relieve the affected railroads only of their duty to contribute financially to the bridge's maintenance cost, and did not intend to repeal the railroads' common law obligations. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (in every pre-emption case, "the purpose of Congress is the ultimate touchstone") (citations omitted). The text of Public Law No. 84-731 contains no express pre-emption, and a comparison of the scope of the common law duties in question with the limited purpose of Public Law No. 84-731 reveals no implied pre-emption. See Cipollone, supra, 505 U.S. at 516, 112 S.Ct. 2608. None of Conrail's alleged common law duties at issue in this case would oblige Conrail to do anything that Public Law No. 84-731 proscribes or to fail to do anything that the statute requires.
[6] Ms. Brown has not contended that the railroad operation itself constitutes an unreasonably dangerous artificial condition for which Conrail could be held liable.
[7] According to BLACK'S LAW DICTIONARY 412 (6th ed.1990), a "dedication" is an "appropriation of land, or an easement therein, by the owner, for the use of the public, and accepted for such use by or on behalf of the public." The dedicating party "reserv[es] to himself no other rights than such as are compatible with the full exercise and enjoyment of the public uses to which the property has been devoted." Id.
[8] The original document was apparently color-coded in red. The document in the record, a photocopy, is printed in black and white.
[9] As Conrail appears to concede, the common law duty springs from possession, and it is "not invariably [placed] on the person in whom the land is titled." Husovsky, supra, 191 U.S.App. D.C. at 251, 590 F.2d at 953 (citation omitted); see also W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 57, at 386 n. 1 (5th ed.1984).
[10] Conrail contends that these inspections were conducted solely for the benefit of its employees, and not in fulfillment of a general duty to maintain the land. However, at oral argument, counsel for Conrail acknowledged that the bridge inspectors would remedy dangerous conditions on the bridge as a matter of course, even though, according to counsel, they had no obligation to do so.
[11] We also note that Conrail has conceded that, notwithstanding the dedication of land, it retains at least a right of way over its railroad tracks. Ms. Brown has not specifically argued in the alternative that Conrail may be held liable for its failure to exercise reasonable care in its control over this narrow strip of land even if the bridge vents are not located thereon, and we do not address that question here.
[12] Under § 365 of the RESTATEMENT, liability is extended to artificial conditions in "dangerous disrepair."
[13] For example, Ms. Brown claims that Conrail should have "plac[ed] some type of protective barrier on its right of way which would have prevented tie plates, ballast and other objects from moving onto and into the bridge vents." Conrail could also arguably have warned the District of any dangerous condition of which Conrail knew or should have known. We have no occasion, at this posture of the litigation, to pass on the reasonableness of such possible courses of action.