Andrew E. BLOCH, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 03–CT–680.

District of Columbia Court of Appeals.

Argued Dec. 2, 2004.

Decided Dec. 30, 2004.

Andrew E. Bloch, pro se.

Sidney R. Bixler, Assistant Attorney General for the District of Columbia, with whom Robert J. Spagnoletti, Attorney General, Edward E. Schwab, Deputy Attorney General, and Rosalyn Calbert Groce, Supervisory Attorney General, were on the brief, for appellee.*

Lisa H. Schertler, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher, Assistant United States Attorney, were on the brief, for Amicus Curiae the United States.**

Arthur B. Spitzer, Washington, DC, for Amicus Curiae The American Civil Liberties Union of the National Capital Area.

Before SCHWELB and GLICKMAN, Associate Judges, and NEWMAN, Senior Judge.

NEWMAN, Senior Judge:

Bloch appeals his conviction for crossing a police-line in the vicinity of the White House in violation of 24 DCMR § 2100.3 (2003) ("the police-line regulation"). He argues that the government's use of a police-line in this case prevented him from exercising his First Amendment right to expressive activity. We conclude that the prosecution failed to present competent and admissible evidence sufficient to meet the "time, place, and manner" test applicable in such cases. We reverse.

## I.

On March 17, 2003, President George W. Bush issued an ultimatum to Saddam Hussein ordering him to relinquish his power in Iraq within forty-eight hours or face war. At trial, and in this court, the prosecution contends that in response to a threat assessment and in anticipation of large numbers of demonstrators in Lafayette Park on March 19, 2003—the ultimatum deadline—the United States Park Police ("USPP"), at the request of the Secret Service, closed off the 1600 block of Pennsylvania Avenue, N.W., (1) to enhance the security zone on the northern side of the White House, and (2) to create a "staging area" to give law enforcement officers room to move around to conduct logistical and crowd control operations.

The perimeter of the "staging area" was a police-line consisting of steel, interlocking fences (called "bicycle fences" because they resemble bicycle racks) that were thirty-six to forty inches in height. The "staging area" ran from 15th to 17th Streets, N.W., and from the northern curb of Pennsylvania Avenue to the White House fence, thereby blocking off the entire sidewalk and the portion of Pennsylvania Avenue directly in front of the White House. Lafayette Park, which is north of the fencing, remained open to demonstrators. Eight to fifteen USPP officers were spread out on the north side of Pennsylvania Avenue to monitor the "staging area." Only persons who were members of the White House staff or otherwise specifically authorized to be at the White House were permitted to enter the "staging area."

On March 19, 2003, a group of demonstrators entered Lafayette Park and approached the northern boundary of the "staging area." When that group stepped

---

\* On May 26, 2004, the Office of the Corporation Counsel for the District of Columbia was renamed the Office of the Attorney General for the District of Columbia. *See* Mayor's Order 2004–92, 51 D.C. Reg. 6052 (2004).

\*\* We appointed the American Civil Liberties Union of the National Capital Area and the United States as amicus curiae in this case. We would like to extend to both of them our thanks for their most able assistance in this case.

over the police-line and sat down inside the "staging area," USPP Officer Peter Ward ("Ward") commanded them not to do so. Shortly thereafter, Bloch and a second group of demonstrators stepped over the police-line, after having been commanded not to, sat down and began to pray. They were arrested and charged with violating the police-line regulation.

At trial, to satisfy its burden to establish the constitutional appropriateness of "time, place and manner" limitations that were imposed, the prosecution presented the testimony of Ward and his supervisor, Sergeant Dale Dawson ("Dawson"). Ward testified that due to a "threat assessment," the USPP, on recommendation of the Secret Service, established the police-line to create a "staging area" to enhance the security zone outside the White House and to enlarge the area for logistical and crowd operations in anticipation of large crowds in Lafayette Park. When the defendants objected to this testimony on the grounds of hearsay, the trial court sustained the objection "in part," ruling: "I'll take it only insofar as it informs this gentleman's behavior. In other words, that was his understanding and upon which he proceeded." Thus, the trial court admitted Ward's testimony under the "state of mind" exception to the hearsay exclusionary rule, not for "the truth of the matter asserted."[1] The other witness called by the prosecution was Dawson. He testified that he had been instructed to keep people from entering onto Pennsylvania Avenue to "make sure traffic could move freely and the only traffic, really on Pennsylvania Avenue since it is closed down is mostly police vehicles." Dawson acknowledged

that he had no personal knowledge of who gave the orders to establish the police-line and on what basis, but that he "imagined" that it was the Chief of the USPP, to whom he had not spoken. Dawson's testimony, like that of Ward, was hearsay.[2] The foregoing hearsay testimony of Ward and Dawson constituted the totality of the prosecution's evidence to meet the burden imposed upon it by the First Amendment.

In rejecting Bloch's First Amendment defense, the trial judge ruled that the issue of whether the government's use of a police-line in front of the White House operated as an improper "time, place, and manner" restriction was not before the court. In so ruling, the trial judge disregarded critical parts of the proceeding before him. The defendants did appropriately raise the issue of the unconstitutional application of the regulation at trial beginning with opening statements in which they proffered that

> [t]he police-line prevented the accused from exercising [their] First Amendment rights in an area established as uniquely important to that expression .... [T]he arrest of docile, nonviolent, prayerful demonstrators in the process of exercising their First Amendment rights without possible injury to anyone around them, constitutes against expressive conduct.... [T]he enforcement of this police-line has served predominantly or exclusively to further the unconstitutional end of abridging First Amendment rights. As such, we will demonstrate that this case has no merit on practical and constitutional grounds, that our actions were orderly, reason-

---

1. At the outset of the proceedings, the trial judge ruled that each defendant would be entitled to adopt a co-defendant's opening and closing statement, objections, and direct and cross-examination.

2. An at least equally valid objection would have been based on the witness' lack of personal knowledge. *See O'Neil v. Bergan,* 452 A.2d 337, 343–44 (D.C.1982) (citing with approval FED. R. EVID. 602).

able, and [ ] protected by our First Amendment rights.

The defendants likewise addressed the constitutional issue in testimony, their cross-examinations of Ward and Dawson and their closing arguments.[3] The trial judge, ruling that the only issue before him was whether the defendants had "adequate notice" of the "police-line" (an issue not meaningfully controverted), held there was adequate notice and found the defendants (save one) guilty.

## II.

■■■ As a general matter, 24 DCMR § 2100.3 (the police-line regulation), does not implicate First Amendment issues. *See generally Virginia v. Hicks*, 539 U.S. 113, 121–24, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003) (trespass regulation not directed at speech is not subject to First Amendment overbreadth challenge). But where the First Amendment is implicated, the constitutionality of a regulation and its application must be measured by the principles and legal standards pertaining to government regulations of speech. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Washington Mobilization Comm. v. Cullinane*, 184 U.S.App.D.C. 215, 227, 566 F.2d 107, 119 (1977).[4]

■■■ While the First Amendment reflects this nation's commitment to the principle that "debate on public issues should be uninhibited, robust, and wide open," *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (internal citations omitted); *accord Boos v. Barry*, 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), "the government may make reasonable regulations, unrelated to the content of the message, concerning the time, place, and manner of the exercise of those liberties." *Leiss v. United States*, 364 A.2d 803, 807 (D.C.1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977) (internal citations omitted). *See also Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) ("[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, and manner restrictions"). The regulation of speech and communicative conduct on public property must be done "only in a narrow and reasonably necessary manner which serves significant government interests." *Smith v. United States*, 445 A.2d 961, 964 (D.C.1982) (en banc) (internal citations omitted). Where the speech occurs in traditional public fora, government regulation must be narrowly tailored to serve a significant public interest and must leave open alternative means and methods of communication. *Compare*

---

**3.** For example, in testifying as to her reasons for crossing the police-line, co-defendant Melinda Smale said,

> As I knelt, I asked the police officer standing in front of me how he explained this war to his children. I admitted that I could not explain that war to my children and I believe that if I cannot do so then it is my responsibility as an American to express dissent in a peaceful way. I am proud that I was able, the next day, to get home again, to have been treated in a way that I thought was fair, and also to be able to look my children in the face and say what it is that I did. I did it to express what I believe is my

right and privilege as an American. I am thankful for that. I recognize it is a privilege and I did it in recognition of all those in the history of this country who have struggled for that privilege in non-violent ways.

**4.** In *Cullinane*, the District of Columbia Circuit upheld the police line regulation against a First Amendment challenge to its facial validity. In this case, unlike *Cullinane*, we are not faced with the necessity to decide the facial validity of the regulation; rather, our focus is on the constitutionality of the regulation as applied.

*United States v. Grace,* 461 U.S. 171, 179, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (sidewalk outside the United States Supreme Court building is a public forum) *with Pearson v. United States,* 581 A.2d 347, 353 (D.C.1990), *cert. denied,* 502 U.S. 808, 112 S.Ct. 51, 116 L.Ed.2d 28 (1991) (steps in front of the United States Supreme Court building are not a public forum). Once the constitutional issue is properly raised, the burden is upon the government to establish the constitutional validity of the restriction. *See Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *CCNV, supra,* 468 U.S. at 293 n. 5, 104 S.Ct. 3065; *United States v. Doe,* 296 U.S.App.D.C. 350, 354, 968 F.2d 86, 90 (1992).

■ In reviewing a trial court's judgment sustaining the constitutionality of the speech limitation, we must "make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 17, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)) (internal quotations omitted); *Guilford Transp. Indus. v. Wilner,* 760 A.2d 580, 592 (D.C. 2000).

■ The section of Pennsylvania Avenue N.W., in front of the White House and its adjacent sidewalks are public fora. *See White House Vigil for the ERA Comm. v. Clark,* 241 U.S.App. D.C. 201, 209–10, 746 F.2d 1518, 1526–27 (1984); *A Quaker Action Group v. Morton,* 170 U.S.App.D.C. 124, 140 n. 49a, 516 F.2d 717, 733 n. 49a (1975). Thus, the government's burden is higher than it is when the forum is nonpublic. *See Frisby v. Schultz,* 487 U.S. 474, 479, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988); *Grace, supra,* 461 U.S. at 177, 103 S.Ct. 1702; *Markowitz v. United States,* 598 A.2d 398, 403 (D.C.1991) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). It is not for this court to second guess the responsible authorities about whether a legitimate governmental interest could have been achieved in a better manner. *See CCNV, supra,* 468 U.S. at 299, 104 S.Ct. 3065. Rather, our duty is to evaluate, on an independent basis, the whole record to insure that there is no forbidden intrusion on First Amendment rights. *See Milkovich, supra,* 497 U.S. at 17, 110 S.Ct. 2695. It is to that task that we now turn.

The United States, as amicus curiae, argues that this case is analogous to *Abney v. United States,* 616 A.2d 856 (D.C. 1992), because the USPP and the Secret Service, like the Capitol Police in *Abney* with respect to the Capitol, made a rational judgment that a restricted perimeter on the north side of the White House would enhance their ability to protect that important property. In *Abney,* the Capitol Police Board, in an effort to address increased security concerns created by the Persian Gulf crisis and potential threats of terrorist activities, issued a written order closing all steps and the areas adjacent to the U.S. Capitol except for certain specified areas. *Id.* at 857. The order specified that its objectives were to ensure the safety of government officials and visitors by maintaining unobstructed passageways for rapid evacuation in case of fire or explosion and to protect persons and property by preventing anyone from placing a bomb or other dangerous device in the area. *Id.* at 857–58. The order also allowed the police to create a comfortable perimeter around the building so they could provide better security for the Capitol, its workers and visitors in the event of

bomb explosions or attack. *Id.* at 858. We held that the order issued by the Capitol Police Board, acting pursuant to its authority over the United States Capitol buildings and grounds under 40 U.S.C. § 212a (2001) served, "a legitimate governmental interest in protecting the Capitol, government officials, and others who work and visit there from potential bomb threats during a unique period of crisis, and it is apparent that the area would have been exposed to greater danger without the regulation than with it." *Id.* at 860. We noted that "we are not in a superior position to the Capitol Police to judge how much protection of the Capitol grounds is wise and how that level of protection is to be attained." *Id.* (internal alterations omitted).

We are likewise not in a position here to second guess decisions of the Secret Service and the USPP to determine how much protection is needed to safeguard the President and the White House. This concern, however, "only poses, it does not answer, the question as to whether the officials [charged with protecting the President] have transformed this concern into an excessive preoccupation with security that is achieved at the unnecessary expense of First Amendment freedoms." *A Quaker Action Group, supra,* 516 F.2d at 723. We are especially aware that in this post-September 11th era the need to balance security against an individual's right to engage in expressive activity at the seat of the federal government is indeed a difficult task. But "[i]t is too difficult, too delicate, too dependent on careful assessment and weighing of constitutional rights, to rest conclusively on the untested declarations of executive officials." *Id. Abney* is distinguishable on its facts because in that case, unlike the one *sub judice,* we had a critical piece of evidence—a police board order expressly outlining why it was necessary to close all steps and areas adjacent to the Capitol—to analyze to determine whether the restriction in that case (1) was justified without reference to the content of the regulated speech, (2) was narrowly tailored to serve significant governmental interests, and (3) left open ample alternative channels for communication. *See Ward, supra,* 491 U.S. at 791, 109 S.Ct. 2746. Here, in stark contrast, the only evidence presented by the government to justify its establishment of the police-line was the hearsay and speculative testimony of Ward and Dawson that the police-line was established to provide for a "staging area" and the free flow of traffic. Because no competent, admissible testimony was presented sufficient to show that the restriction on expressive activity was narrowly tailored to serve a significant governmental interest, we need not decide whether the remaining prongs of the tripartite *Ward* test—content neutrality and leaving open ample alternative channels of communication—were satisfied. *See id.; CCNV, supra,* 468 U.S. at 293, 104 S.Ct. 3065. We do not know and thus can not say, whether the prosecution *could* have provided the requisite evidence to sustain the constitutional validity of these arrests and prosecutions. On this record we do know, and thus say, it *did not.*

The conviction is, therefore, reversed with directions to enter a judgment of acquittal.

*So ordered.*