William M. STREIT, Elizabeth McAlister, Jerome Zawada, Elizabeth Adams, Malachy Kilbride, Deborah Churchman, Janine Boneparth, Susan S. Crane, Eve L. Tetaz, David O. Barrows, Joan H. Nicholson, Sandra K. Warren, and Desiree Ali–Fairooz, Appellants,

v.

DISTRICT OF COLUMBIA, Appellee.

Nos. 07–CT–788, 07–CT–789, 07–CT–790, 07–CT–805, 07–CT–806, 07–CT–807, 07–CT–808, 07–CT–809, 07–CT–810, 07–CT–811, 07–CT–812, 07–CT–822, 07–CT–823, 07–CT–849.*

District of Columbia Court of Appeals.

Submitted Dec. 14, 2010.

Decided Aug. 11, 2011.

---

5. D.C. Bar R. XI, § 12.1(d).
* The corresponding Superior Court case numbers are: CTF 8027–07, CTF 8160–07, CDC 8162–07, CTF 7350–07, CTF 7685–07, CTF 7729–07, CDC 7857–07, CTF 7995–07, CDC 8020–07, CDC 8021–07, CDC 9251–07, CDC 8979–07, CDC 8980–07, and CDC 8163–07.

Mark Goldstone, Washington, DC, appointed by the court, was on the brief for appellants.

Peter J. Nickles, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, Rosalyn Calbert Groce, Deputy Solicitor General, and John J. Woykovsky, Assistant Attorney General, were on the brief for appellee.

Before GLICKMAN and OBERLY, Associate Judges, and FERREN, Senior Judge.

GLICKMAN, Associate Judge:

The criminal charges lodged against the appellants in these fourteen consolidated appeals stem from their participation in demonstrations against the war in Iraq at

the White House on March 16, 2007, and/or at the Cannon House Office Building on March 22, 2007. The demonstrations culminated in mass arrests. The appellants now before us were tried together with several other defendants in a single proceeding before the court without a jury. All the defendants were *pro se*. (A so-called "attorney-advisor" was present to offer them assistance, but he did not participate actively in the trial.) The appellants arrested at the White House were convicted of either failure to obey a lawful order of a police officer ("FTO") in violation of 18 DCMR §§ 2000.2 and 2000.10 (2006), or crossing a police line ("CPL") in violation of 24 DCMR §§ 2100.1 and 2100.3 (2006). The appellants arrested at the Cannon House Office Building were convicted of disorderly conduct in violation of D.C.Code § 22–1321(1) (2001).

The four appellants convicted of disorderly conduct (appellants Boneparth, Tetaz, Barrows, and Ali–Fairooz) have made no argument in this court against those convictions. Consequently, we treat their challenges as waived.[1]

The appellants found guilty of either FTO or CPL attack their convictions on numerous grounds. Without needing to address all their contentions, we agree that their convictions cannot stand because the evidence is insufficient to sustain them or to justify the police actions restricting appellants' First Amendment rights.

### I. Factual Background

The appellants convicted of FTO or CPL were participants in a peaceful nighttime demonstration—described at trial without contradiction as a quiet prayer vigil—on the sidewalk in front of the White House.[2]

---

1. See *Tetaz v. District of Columbia*, 976 A.2d 907, 910 (D.C.2009).

2. "The section of Pennsylvania Avenue N.W.[ ] in front of the White House and its

They had been issued a valid permit for this demonstration and, obviously, were exercising their First Amendment rights of speech and assembly in doing so. At some point during the night, Captain Robert McClain of the United States Park Police (who did not testify at trial) decided that the demonstrators, who numbered well over a hundred, were violating a National Park Service ("NPS") regulation that prohibits stationary signs in the center portion of the White House sidewalk and requires demonstrators carrying signs there to "continue to move along the sidewalk."[3] For that purported violation, Captain McClain chose to revoke the demonstrators' permit.[4] Lieutenant Phillip Beck (who did testify at trial) warned the demonstrators that they were in violation of applicable regulations, that their permit was revoked, and that they would be arrested if they did not leave the area. After Lieutenant Beck delivered those warnings three times, the police arrested at least fifty demonstrators for failing to leave the scene as ordered. These arrestees were charged with FTO. Following the arrests, the Park Police set up a police line on the White House sidewalk with yellow "Police Line" tape and signs. An unspecified number of demonstrators were arrested for crossing the police line and charged with CPL. Lieutenant Beck confirmed at trial that he gave "verbal warnings to the demonstrators as a whole not to cross over the fencing." He did not describe when or how he gave those warnings, however, or whether the appellants were in a position to have heard them. There was no testimony on those points.

Before we discuss the sufficiency of the evidence to prove the elements of the FTO and CPL violations and to justify the restrictions placed on appellants' First Amendment activities, there is a preliminary matter we think it desirable to mention—the government's failure for the most part to present evidence establishing appellants' identity as the alleged offenders. The government called only two witnesses at trial. Its first witness, Lieutenant Beck, did not participate in making any of the arrests and did not testify about any of the appellants specifically. The government's second witness, Officer Joseph Bellino, participated in making some fifty arrests, but the only appellant now before us whom he could identify or testify about was appellant Malachy Kilbride. (Officer Bellino remembered arresting Kilbride for his failure to leave the White House sidewalk as directed.[5]) Thus, the

---

adjacent sidewalks are public fora." *Bloch v. District of Columbia*, 863 A.2d 845, 850 (D.C. 2004).

3. In pertinent part, the regulation in question read as follows:

> No signs or placards shall be held, placed or set down on the center portion of the White House sidewalk, comprising ten yards on either side of the center point on the sidewalk; *Provided, however,* that individuals may demonstrate while carrying signs on that portion of the sidewalk if they continue to move along the sidewalk.

36 CFR § 7.96(g)(5)(viii) (2006). The purpose of this regulation is solely to preserve the public's unobstructed view of the White House. *White House Vigil for the ERA Committee v. Clark*, 241 U.S.App.D.C. 201, 217,

746 F.2d 1518, 1534 (1984) ("No considerations of security or safety are at stake; the governmental interest derives wholly from aesthetic concerns.").

4. "During the conduct of a demonstration, a permit may be revoked by the ranking U.S. Park Police supervisory official in charge if continuation of the event presents a clear and present danger to the public safety, good order or health or for any violation of applicable law or regulation." 36 CFR § 7.96(g)(6) (2006).

5. Appellant Kilbride testified in the defense case and acknowledged his participation in the demonstration but did not admit to having disobeyed the order to disperse or having crossed the police line.

government called no witness who, from personal knowledge, could identify any of the appellants (with one exception) as having participated in the demonstration at all or—more importantly—as having been one of the demonstrators who disobeyed the order to disperse or who crossed the police line.

Instead of calling witnesses who were competent to identify the appellants and describe what they did to be arrested, the government relied on a stipulation by the defendants. This stipulation was not in writing. Rather, at the beginning of the trial, the prosecutor announced that all the defendants had stipulated that "they were, in fact, the individuals arrested for crossing a police line or failure to obey on March 16th or 17th of 2007 at the White House." The prosecutor acknowledged that by their stipulation, appellants were "[n]ot admitting to guilt of course," but rather "were only admitting that they were the ones who had been arrested" for one charge or the other. Nonetheless, the prosecutor asserted that, by virtue of the stipulation, "identity will not be an issue."

At the time, the *pro se* defendants and their attorney-advisor voiced no objection to that (arguably opaque) assertion, though in closing argument the defendants' spokesperson (one of the defendants who is not among the appellants here) objected to the prosecutor's reliance on the stipulation to establish their guilt.[6] We perceive the scope of the stipulation to be ambiguous, and we note that the trial court did not resolve the ambiguity by inquiring of the *pro se* defendants themselves (or their attorney-advisor) as to whether it established their identities as

demonstrators who had disobeyed the order to disperse or crossed the police line.[7] In finding appellants and the other defendants guilty, the court was persuaded by the prosecutor's argument that there was a "nexus" between their stipulation and the Park Police officers' testimony because (1) the officers testified "by their observations that the people that were arrested that night were arrested because they committed these crimes," and (2) the defendants "stipulated to being the people of the group who were arrested and committed those crimes." We are dubious about both prongs of that argument. Neither prosecution witness professed to have personal knowledge as to the wrongful behavior of *everyone* who was arrested at the White House (or, with the exception of appellant Kilbride, of the particular defendants in the courtroom), nor are we convinced by the prosecutor's interpretation of the stipulation itself.

Troubled as we are by the adequacy of the proof of identification, we refrain from deciding these appeals on that issue. Although appellants' consolidated brief mentions that "no particularized evidence of individual wrongdoing was presented against any of the individual Appellants,"[8] the brief does not argue that the trial court erred in relying on the stipulation and the prosecutor's rationale to find them guilty. And we conclude that appellants are entitled to reversal of their convictions for other reasons, to which we now turn. Nonetheless, as will be seen, the dearth of evidence in the record as to the particular conduct of each appellant is not without consequence.

---

**6.** Appellants' spokesperson complained of the prosecutor's "radical misuse of [the] stipulation" in his summation.

**7.** The court accepted the prosecutor's oral representation as to the existence and content

of the stipulation without confirming it with the defendants.

**8.** Consolidated Brief of Appellants at 5.

## II. Failure to Obey a Lawful Order of a Police Officer

Appellants were convicted of FTO for failing to comply with the order to stop their demonstration and disperse. The offense was proscribed by 18 DCMR § 2000.2 (2006), which states: "No person shall fail or refuse to comply with any lawful order or direction of any police officer ... invested by law with authority to direct, control, or regulate traffic. This section shall apply to pedestrians and to the operators of vehicles." Appellants argue that the order to disperse was not a lawful order, and that it violated their First Amendment rights, because the Park Police lacked legitimate grounds to revoke their permit to demonstrate. The trial court made no finding on the issue, possibly because it was of the view that "even if [Captain McClain] mistakenly revoked the permit, that didn't give [the demonstrators] the right to refuse the instructions of the officers." We conclude the issue is dispositive, however.

■ The lawfulness of the order is an element of the offense of FTO. It is the government's burden to prove that element beyond a reasonable doubt, not only to secure appellants' convictions, but also to establish that the police interference with appellants' First Amendment-protected activity was permissible. In the present case, the lawfulness of the order to disperse turns on whether the police decision to revoke the demonstration permit was lawful, for if the decision to revoke the permit was not lawful, the order to disperse contravened the terms of the permit

and was in derogation of appellants' First Amendment rights.[9]

The lawfulness of the police decision to revoke the permit turned on whether the demonstrators violated the NPS regulation that prohibited stationary signs and placards in the center portion of the White House sidewalk and required demonstrators carrying signs there to "continue to move along the sidewalk." No other justification for revoking the demonstration permit has been suggested. Yet although the propriety of the revocation was in dispute, and the applicable regulation, 36 CFR § 7.96(g)(5)(viii), was identified at trial, the government presented no evidence whatsoever that this regulation was violated. In fact, there was no testimony that *any* of the demonstrators on the White House sidewalk had signs or placards at all.[10] Appellant McAlister questioned Lieutenant Beck about this, asking

> [W]ould you be able to testify how many of the people when the permit was revoked were holding signs? How many of us did you see holding signs?

Lieutenant Beck answered, "I don't know." And Officer Bellino, when asked to recount how the arrests came about, described the demonstrators as praying, singing, and holding candles; he said nothing about their having signs or placards. Thus, if anything, the evidence at trial tended to contradict the claim that the demonstrators violated 36 CFR § 7.96.

Citing *Karriem v. District of Colum-*

---

9. See *Bloch v. District of Columbia*, 863 A.2d 845 (D.C.2004), a case in which this court overturned a conviction for crossing a police line in the vicinity of the White House because the government failed to justify its restriction of the defendant's First Amendment rights with competent and admissible evidence. "Once the constitutional issue is

properly raised," we said, "the burden is upon the government to establish the constitutional validity of the restriction" as a "time, place, and manner" regulation. *Id.* at 850.

10. Kilbride, the only appellant who testified, denied carrying a sign.

*bia,*[11] the government argues that the invalidity of the permit revocation by the police gave appellants no right to refuse to obey the police order to disperse. (The question, put more precisely, is whether the invalidity of the permit revocation precludes appellants' FTO convictions because it rendered the order to disperse illegal and an unjustified infringement on appellants' First Amendment rights.) But even setting aside the fact that *Karriem* was not a First Amendment case, the government misreads the decision. Mr. Karriem was charged with FTO for disobeying a police directive to move his vending stand because he had parked it in front of a "No Parking" sign. It later was established, as Karriem had claimed, that the sign was invalid because it had been erected without proper advance notice to the public. Nonetheless, this court stated, the sign's "invalidity did not give [Karriem] the right to refuse to move when the police told him to do so."[12] The reason, though, was that "[t]he sign appeared on its face to be a valid and proper sign," to be enforced as written; indeed, we said, "[t]hat fact gave the police officers objective probable cause to arrest [Karriem] for committing a crime in their presence, regardless of whether or not the sign had been erected improperly."[13] In other words, the evidence in *Karriem* showed that the police order to move in that case was a lawful order because the facts known to the police appeared to justify it. Here, in contrast, the government failed to show that the order to disperse was lawful. The demonstra-

tors were exercising their First Amendment rights under a valid permit, and there is no evidence that the facts known to the police appeared to justify their revocation of that permit and consequent order to disperse. The record does not show the police had any reason to believe the demonstrators had forfeited their rights by violating 36 CFR § 7.96 (or any other law or regulation).

The government's dual failure at trial to prove an essential element of the offense and to present "competent, admissible testimony ... sufficient to show that the restriction on expressive activity was narrowly tailored to serve a significant governmental interest"[14] requires us to reverse appellants' FTO convictions. "We do not know and thus can not say, whether the prosecution *could* have provided the requisite evidence to sustain the constitutional validity of these arrests and prosecutions. On this record we do know, and thus say, it *did not.*"[15]

### III. Crossing the Police Line

■ The police line was established solely to effectuate the revocation of the demonstration permit and prevent the demonstrators from continuing to engage in their public protest in front of the White House. Consequently, as in *Bloch,* the government's failure to justify the restriction on appellants' expressive activity also requires us to reverse their CPL convictions.[16] It is well to add that the government also failed to present sufficient evi-

---

11. 717 A.2d 317 (D.C.1998).

12. *Id.* at 320. It should be noted that Karriem had sued the police for false arrest and the question before the court was whether the police had probable cause to make the arrest, not whether Karriem properly could be convicted of FTO. In fact, the FTO charge against Karriem was dropped when the invalidity of the "No Parking" sign was discovered.

13. *Id.* at 320, 321.

14. *Bloch,* 863 A.2d at 851.

15. *Id.*

16. *See id.*

dence at trial to prove that appellants committed the charged CPL violations—even assuming the evidence together with the stipulation sufficed to show that appellants actually did cross a police line (there being no testimony that any of them did so).

In pertinent part, the police line regulations in 24 DCMR § 2100 provide as follows:

2100.1. When fires, accidents, wrecks, explosions, parades, or other occasions cause or may cause persons to collect on the public streets, alleys, highways, or parkings, the Chief of Police, an inspector or captain of the police, or an officer acting for him or her may establish an area or zone that he or she considers necessary for the purpose of affording a clearing for the following:

(a) The operation of firemen or policemen;

(b) The passage of a parade;

(c) The movement of traffic;

(d) The exclusion of the public from the vicinity of a riot, disorderly gathering, accident, wreck, explosion, or other emergency; and

(e) The protection of persons and property.

\* \* \*

2100.3. No person shall enter the emergency area or zone unless duly authorized by the person in command of the emergency occasion[.]

As the court stated in *Washington Mobilization Committee v. Cullinane*,[17] upholding the constitutionality of the police line regulation against a vagueness and overbreadth challenge,

Under the [police line] regulation a citizen must not cross a police line without authority and he must obey any police order necessary to effectuate any of the five specified purposes of the line. If the location of the line is clearly indicated and if adequate notice is given, which we interpret to be requirements implicit in the regulation, its application will not trap innocent persons.[18]

None of the five specified purposes of a proper police line was shown to exist at trial in this case. But even assuming the government did not need to make such a showing—a question we need not resolve—it presented no evidence that the location of the line was clearly indicated to appellants when they (allegedly) crossed it, or that appellants received adequate notice not to cross. There was no testimony as to when, where, or under what circumstances, any of the appellants crossed the police line. That Lieutenant Beck may have given "verbal warnings *to the demonstrators as a whole* not to cross over the fencing" falls well short of the necessary proof that appellants received and heard those warnings or otherwise were on notice not to cross.

## IV. Conclusion

Appellants' FTO and CPL convictions are flawed and cannot stand. Accordingly, the judgments of conviction are hereby reversed in Nos. 07–CT–788 (appellant Streit), 07–CT–789 (appellant McAlister), 07–CT–790 (appellant Zawada), 07–CT–805 (appellant Adams), 07–CT–806 (appellant Kilbride), 07–CT–807 (appellant Churchman), 07–CT–809 (appellant Crane), 07–CT–812 (appellant Nicholson), 07–CT–822 (appellant Tetaz), and 07–CT–823 (appellant Warren).

As explained above, the challenges of certain appellants to their disorderly con-

17. 184 U.S.App.D.C. 215, 566 F.2d 107 (1977).

18. *Id.,* 184 U.S.App.D.C. at 226, 566 F.2d at 118.

duct convictions have been waived. Accordingly, the judgments of conviction are hereby affirmed in Nos. 07–CT–808 (appellant Boneparth), 07–CT–810 (appellant Tetaz), 07–CT–811 (appellant Barrows), and 07–CT–849 (appellant Ali–Fairooz).

*So ordered.*