# District of Columbia
# Court of Appeals

**Nos. 14-CT-956 to 14-CT-967**

ANTOINETTE BOLZ, *et al.*,

Appellants,

v.

DISTRICT OF COLUMBIA,

Appellee.

FILED

DEC - 8 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

CDC-2624-12; CDC-2625-12;
CDC-2626-12; CDC-2642-12;
CDC-2643-12; CDC-2648-12;
CDC-2651-12; CDC-2652-12;
CDC-2654-12; CDC-2656-12;
CDC-2659-12; CDC-2661-12

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: BLACKBURNE-RIGSBY and EASTERLY, *Associate Judges*; and STEADMAN, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the protesters' convictions under the Crowd and Traffic Control Regulation are reversed, and protester David Givens's conviction for indecent exposure is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: December 8, 2016.

Opinion by Associate Judge Catharine Easterly.

Opinion by Senior Judge John Steadman, concurring in judgment.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

14-CT-956 to 14-CT-967

FILED 12/8/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

ANTOINETTE BOLZ, ET AL., APPELLANTS

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(Nos. CDC-2624-12, CDC-2625-12, CDC-2626-12, CDC-2642-12, CDC-2643-12,
CDC-2648-12, CDC-2651-12, CDC-2652-12, CDC-2654-12, CDC-2656-12,
CDC-2659-12, CDC-2661-12)

(Hon. Elizabeth Carroll Wingo, Magistrate Judge)
(Hon. Heidi M. Pasichow, Associate Judge)

(Argued December 3, 2015                    Decided December 8, 2016)

*Jeffrey L. Light* for appellants.

*John D. Martorana*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Rosalyn Calbert Groce*, Deputy Solicitor General, and *John J. Woykovsky*, Assistant Attorney General, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and EASTERLY, *Associate Judges*, and STEADMAN, *Senior Judge*.

Opinion by *Senior Judge* STEADMAN, concurring in the judgment, at page 30.

EASTERLY, *Associate Judge*:  In the fall of 2011, Occupy D.C. protesters began demonstrating in McPherson Square, a federal park.  For weeks, they remained there with the tacit, if not express, permission of the federal authorities.  Then, one morning in early December, they assembled a wooden structure in the park, the "Occubarn."  The United States Park Police told the protesters to take it down.  The protesters did not.  After an all-day standoff,  the police cleared the area of the Occubarn and tore it down.  In the course of these events, the police arrested a number of protesters for failing to obey an order to vacate a structure presumptively deemed unsafe under the District's building regulations.  These regulations do not apply to federal land, however, and the District of Columbia prosecuted these protesters under a different regulation—the Crowd and Traffic Control regulation—which makes it a crime to fail to obey a crowd and traffic clearing order.  The District also prosecuted one protester, David Givens, for indecent exposure and disorderly conduct.

As a group, the protesters challenge their Crowd and Traffic Control convictions on grounds that the evidence was legally insufficient to establish that that they disobeyed a legitimate crowd and traffic clearing order. We agree. The Crowd and Traffic Control regulation does not authorize or require compliance with police orders to clear people from any public space at any time.  Rather, the

regulation only applies "[w]hen fires, accidents, wrecks, explosions, parades, or other occasions cause or may cause persons to collect" in the District's public thoroughfares; and these "emergency occasion[s]" only empower police to issue, and demand compliance with, orders "necessary for the purpose of affording a clearing" of those thoroughfares to advance one of the listed objectives of the regulation. 24 DCMR §§ 2100.1–.2 (1983). Although these objectives broadly include the "protection of persons and property," § 2100.1 (e), the purpose asserted by the District for the clearing order in this case, there must be a nexus between this objective and clearing crowds on the District's public thoroughfares. Moreover, the safety concerns at issue must be substantiated.

We conclude that, although the construction of the Occubarn constituted an "emergency occasion," the protesters did not fail to comply with a "necessary order." The order was not "necessary for the purpose of affording a clearing" of a public thoroughfare because it cleared people from a public park. And, it was not "necessary . . . for the protection of persons and property," in the absence of evidence that the police had reason to believe the Occubarn posed a danger to anyone, in particular vis-à-vis crowds on public thoroughfares. As no reasonable factfinder could conclude that the protesters had an obligation to obey the order

issued under the Crowd and Traffic Control regulation, we reverse their convictions thereunder.[1]

Mr. Givens separately challenges his conviction for indecent exposure, arguing that D.C. Code § 22-1312 (2016 Supp.) is unconstitutionally overbroad. Concluding that the statute is not substantially overbroad in relation to its plainly legitimate sweep, we affirm his conviction.

## I.    Facts and Procedural History

In the fall of 2011, protesters across the country "occupied" public spaces "to bring awareness to the[ir] concerns about United States economic policy, wealth disparity and the political process."[2]  At the beginning of October, the Occupy D.C. movement established its base of operations in McPherson Square, a

---

[1]  Because we conclude that the protesters' convictions must be reversed on sufficiency grounds, we need not address their arguments that the District's Crowd and Traffic Control regulation is unconstitutionally overbroad or that the trial court committed reversible error by not sanctioning the government under Rule 16 for failing to preserve the Occubarn as evidence.

[2]  *Henke v. Dep't of the Interior*, 842 F. Supp. 2d 54, 56 (D.D.C. 2012) (alteration in original).

federal park close to the District's corporate lobbying corridor on K Street NW.[3]

The record does not establish whether the protesters had a permit to occupy the park,[4] but it appears that federal authorities did not challenge their presence in the park until December 4, 2011, when the events leading to the convictions now on appeal took place.[5]

Before sunrise that morning, Occupy protesters began to assemble a wooden structure in the park. Resembling a barn, and thus earning the moniker "the Occubarn," the approximately 16 by 24 by 30 foot structure consisted of four modular framing pieces. The Occubarn was meant to be both functional, to protect the protesters from winter weather, and symbolic, to represent the foreclosure crisis, a central concern of their movement. Although the protesters planned to add walls and a roof, the framed space was largely open.

Later that morning, the U.S. Park Police arrived in McPherson Square and informed the protesters that the Occubarn had to be taken down. Apparently aware

---

[3] *See id.* at 57.

[4] It is possible that they did not need one. *See* 36 C.F.R. § 7.96 (g)(2)(ii)(B) (2011) (exempting from the permit requirement, under certain circumstances, demonstrations in McPherson Square of no more than five hundred people).

[5] *See Henke*, 842 F. Supp. 2d at 57–58.

that federal regulations allow the use of temporary structures during demonstrations,[6] the protesters offered to show the police that the Occubarn was not permanent and could be taken apart; but according to one protester, the police "didn't seem interested in that at all." The police gave the protesters one hour to discuss the removal of the structure. The protesters held a meeting within the Occubarn but could not reach a consensus about how to proceed. About midday, ten to fifteen U.S. Park Police officers, some on horses, partially surrounded the structure. The mounted officers then rode into it, causing some protesters to climb into the rafters to get out of their way. Other protesters left the area of the Occubarn.

In the meantime, an inspector from the District's Department of Consumer and Regulatory Affairs (DCRA), received a request for assistance at McPherson Square. Arriving around 12:30 p.m., the inspector examined the Occubarn and saw no signs of imminent danger; instead he noted that "the building appeared pretty solid." Nevertheless, because it seemed to have been erected without a building permit, he determined, pursuant to the District's building regulations, that it "should not be occupied." He came to this conclusion even though (as he later

---

[6] *See* 36 C.F.R. § 7.96 (g)(5)(vi) (authorizing under certain circumstances "temporary structures [to] be erected for the purpose of symbolizing a message or meeting logistical needs").

acknowledged at trial) the District's building regulations do not apply to federal property. *See* 12A DCMR § 101.5 (2008) (exempting federal property from the District's building regulations). He informed the on-site U.S. Park Police commander that the Occubarn should be "posted," i.e., a "standard danger placard" should be affixed to the structure "indicating that it's not safe."[7] But the commander asked him to wait until the police had "done some more crowd control activities."

Lieutenant Robert Lachance of the U.S. Park Police arrived at McPherson Square and assumed command of the scene late that afternoon. At that point, there were still about two dozen people inside the Occubarn. The lieutenant told them that "an inspector was going to come and look at the structure to see if it was safe." He also told them that if the remaining protesters were required to leave the Occubarn, he would give them multiple warnings and anyone who left before he gave the final warning would not be arrested.

---

[7] At trial, the inspector indicated it was his understanding that under 12A DCMR § 115.1 of the District's building regulations, the failure to complete the permitting process and obtain a certificate of occupancy rendered a structure unsafe as a matter of law.

Approximately four hours after the inspector arrived at McPherson Square, he posted the Occubarn. At this point, the police put tape around the Occubarn, leaving the doorway on the south side open so that people could exit if they chose. Lieutenant Lachance then ordered the protesters to "vacate the area," issuing the same warning three times: "Attention. This is Lieutenant Lachance of the United States Park Police. This structure has been deemed unsafe by DC[RA]. You must vacate the area or be arrested."[8] None of the protesters left the structure and the police eventually arrested them all.

One of the protesters, Mr. Givens, had climbed up into the rafters of the Occubarn and resisted multiple attempts by the police to remove him. While there, he developed an urgent need to urinate and relieved himself off the top of the structure in full view of the people on site. Some time later, Mr. Givens complied with the police requests, came down from the rafters, and was arrested. After the police completed the arrests, they bulldozed the Occubarn and discarded the debris.

---

[8] This was the lieutenant's best recollection at trial of the warning he issued. Before trial, the District had represented that he specifically cited 12 DCMR § 115.1 in his warning to the protesters.

The District charged all twelve of the protesters involved in this appeal[9] with failing to obey a crowd and traffic clearing order under the District's Crowd and Traffic Control regulation, 24 DCMR § 2100.2. Mr. Givens was additionally charged with indecent exposure[10] and disorderly conduct.[11]

The protesters moved to dismiss the Crowd and Traffic Control charges, arguing that 24 DCMR § 2100.2 is unconstitutionally vague and overbroad. The magistrate judge presiding over the case denied the motion, reasoning that § 2100.2 must be read in conjunction with § 2100.1[12] and "applies only in very

---

[9] Antoinette Bolz, David Givens, Richard Lehner, Nathaniel Gorecki, Sariel Lehyani, Georgia Pearce, Caitlin McClure, Emm Talarico (named Marc Smith at the time of trial), Andrew Veysey, Kelly Mears, Sophie Vick, and George Parsons.

[10] D.C. Code § 22-1312 (2016 Supp.).

[11] D.C. Code § 22-1321 (e) (2016 Supp.) ("It is unlawful for a person to urinate . . . in public, other than in a urinal or toilet.").

[12] 24 DCMR § 2100.1 first provides:

> When fires, accidents, wrecks, explosions, parades, or other occasions cause or may cause persons to collect on the public streets, alleys, highways, or parkings, the Chief of Police, an inspector or captain of the police, or an officer acting for him or her may establish an area or zone that he or she considers necessary for the purpose of affording a clearing for the following:
>
> > (a) The operation of firemen or policemen;
> >
> > (b) The passage of a parade;
> >
> > (c) The movement of traffic;

(continued…)

specific circumstances." The trial court also rejected the protesters' argument that the Crowd and Traffic Control regulation did not authorize the police to clear a public park, like McPherson Square. Defense counsel had argued that the regulation applied only to "public streets, alleys, highways, or parkings,"[13] not to parks. But the magistrate judge concluded that the "explicit language" of the regulation did not require "the failure to obey the order . . . to occur . . . on those areas." In the same pretrial motion, Mr. Givens challenged the indecent exposure statute as unconstitutionally overbroad; the magistrate judge denied that challenge as well.

After a five-day bench trial, the magistrate judge announced her verdict. Acknowledging that there was no dispute that the protesters had failed to obey Lieutenant Lachance's order to clear the area of the Occubarn, she explained that the protesters' duty to comply with the order turned on whether the order itself was

---

(…continued)

> (d) The exclusion of the public from the vicinity of a riot,
> disorderly gathering, accident, wreck, explosion, or other
> emergency; and

> (e) The protection of persons and property.

24 DCMR § 2100.2 then provides: "Each person present at the scene of an emergency occasion shall comply with any necessary order or instruction of any police officer."

[13] *See infra* note 18 (discussing the definition of "parking").

lawful. Referencing 24 DCMR § 2100.1, the magistrate judge concluded that this had been "an emergency occasion" and the police had issued a "necessary order" under § 2100.2. Accordingly, the magistrate judge found the protesters guilty beyond a reasonable doubt of failing to obey a clearing order under the Crowd and Traffic Control regulation. The magistrate judge also found Mr. Givens guilty of both disorderly conduct and indecent exposure because he had made an unnecessary "display" of himself while urinating. An associate judge of the Superior Court reviewed this verdict[14] and affirmed the protesters' convictions. This appeal followed.

## II.  Analysis

### A.  Failure To Obey a Crowd and Traffic Control Order

The protesters argue that their convictions for failure to obey an order under the District's Crowd and Traffic Control regulation are unsupported by sufficient evidence and must be reversed. In bench trials and jury trials alike, we review

---

[14] *See* D.C. Code § 11-1732 (k) (2013 Repl.); Super. Ct. Crim. R. 117 (g)(1).

challenges to the sufficiency of evidence de novo.[15]  *High v. United States*, 128 A.3d 1017, 1020 (D.C. 2015).  We examine the evidence in the light most favorable to the government, "with due regard for the right of the . . . trier of fact[] to weigh the evidence, to determine the credibility of witnesses, and to draw reasonable inferences."  *Nero v. United States*, 73 A.3d 153, 157 (D.C. 2013).  But if the evidence so viewed "is such that a reasonable [factfinder] *must* have a reasonable doubt as to the existence of any of the essential elements of the crime," it is insufficient and we must reverse.  *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc).

The protesters were convicted under 24 DCMR § 2100.2, which states that any "person present at the scene of an emergency occasion shall comply with any necessary order or instruction of any police officer."  Restated, there are three elements to this offense:  (1) the defendant must be present at the scene of an emergency occasion; (2) the police must issue a necessary order; and (3) the defendant must fail to comply.  In this case, the third element—the protesters' noncompliance with the U.S. Park Police order to vacate the Occubarn—is

---

[15]  We owe no deference to the associate judge's affirmance of the magistrate judge's order.  *Bradley v. District of Columbia*, 107 A.3d 586, 594 (D.C. 2015) (citing Super. Ct. Crim. R. 117).

undisputed.[16] The viability of the protesters' convictions thus turns on whether the District presented sufficient evidence regarding the first two elements: that the protesters were present at the scene of an emergency occasion and that the crowd and traffic clearing order was necessary to address it. *Cf. Streit v. District of Columbia*, 26 A.3d 315, 319 (D.C. 2011) (reversing appellants' convictions for failure to obey a "lawful order" under 18 DCMR § 2000.2 because the government did not present sufficient evidence that the police order was lawful).

This court has not previously considered what constitutes "an emergency occasion" or a "necessary order" under § 2100.2, neither of which is expressly defined in the Crowd and Traffic Control regulation. As the parties have acknowledged throughout this litigation, however, the regulation must be read as a whole. *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 118 (D.C. Cir. 1977) (noting that interpretation of the Crowd and Traffic Control regulation "must be based upon reading the entire regulation rather than 'a part or word thereof'")

---

[16] We note, however, that the police did not tell the protesters that the clearing order was issued under the District's Crowd and Traffic Control regulation. Instead, the police directed the protesters to vacate the structure pursuant to 12A DCMR § 115 of the D.C. building regulations. The protesters have not argued that this discrepancy had any impact on the adequacy of the notice they received or the legitimacy of their arrest. Thus, we do not address this issue.

(quoting *Siegman v. District of Columbia*, 48 A.2d 764, 766 (D.C. 1946)).[17] Doing so conforms to basic principles of statutory and regulatory construction. *See Washington v. District of Columbia*, 137 A.3d 170, 174 (D.C. 2016) (acknowledging that this court must "look to the provisions of the whole law"). Reading this particular regulation as a whole is all the more appropriate because what is now a regulation with subparts, 24 DCMR § 2100.1–.4, was an undivided paragraph in its original version, D.C. Police Reg., art. 6, § 5a (1963).

We first examine the requirement under § 2100.2 that the defendant be "present at the scene of an emergency occasion." We find guidance as to the meaning of "emergency occasion" from the original version of the regulation, which indicated at the outset (as it still does in § 2100.1) that it applied "[w]hen fires, accidents, wrecks, explosions, parades, or other occasions cause or may

---

[17] In *Cullinane*, the United States Court of Appeals for the District of Columbia Circuit considered vagueness and overbreadth challenges to D.C. Police Reg., art. 6, § 5a (1963), the Crowd and Traffic Control regulation's predecessor. *Cullinane*, 566 F.2d at 117–19. Although we conclude that we need not address the constitutional claims in this case, we find some of the statutory construction in *Cullinane* persuasive authority for our analysis of what must be proved to support a conviction for failure to obey a crowd and traffic clearing order. *See M.A.P. v. Ryan*, 285 A.2d 310, 312–13 (D.C. 1971) (holding that this court is not bound by decisions of the D.C. Circuit issued after December 29, 1971).

cause persons to collect on the public streets, alleys, highways, or parkings."[18]

D.C. Police Reg., art. 6, § 5 (a). It then demanded compliance with clearing orders from "every person *at such an occasion*," *id.* (emphasis added), clearly referring back to that opening clause.[19] When the regulation was divided into its current

---

[18] The antiquated term "parking" refers to interstitial areas of the public thoroughfares and is not to be confused with a park. Black's Law Dictionary defines the term as a "strip of land, lying either in the middle of the street or in the space between the building line and the sidewalk . . . intended to be kept as a park-like space." *Black's Law Dictionary* (4th ed. 1951). The regulation governing the "upkeep" of "public parking[s]," 24 DCMR § 102 (1981), defines the term, for the purposes of that section, slightly differently as "that *area of public space* devoted to open space, greenery, parks, or parking *that lies between the property line, which may or may not coincide with the building restriction line, and the edge of the actual or planned sidewalk that is nearer to the property line*," § 102.8 (emphases added). The regulation further requires owners or occupants of property abutting such "parkings" to maintain them. § 102.1. The government cites both these authorities in its brief without reconciling their meaning. But however a parking under § 2100.1 is precisely delimited, it does not extend to a public park like McPherson Square.

[19] Thus the regulation read in relevant part:

> *When fires, accidents, wrecks, explosions, parades, or other occasions cause or may cause persons to collect on the public streets, alleys, highways, or parkings* . . . [a police officer] may establish such area or zone as he considered necessary for the purpose of affording a clearing for: (1) the operation of fireman or policemen; (2) the passage of a parade; (3) the movement of traffic; (4) the exclusion of the public from the vicinity of a riot, disorderly gathering, accident, wreck, explosion, or other emergency; and (5) the protection of persons and property. Every person present at the scene *of such an occasion* shall comply with any necessary order or instruction of any police officer." *Id.* (emphases added).

subparts—§ 2100.1 (addressing the authority of the police to clear public thoroughfares in certain circumstances) and § 2100.2 (addressing the obligation to obey clearing orders)—the opening clause of § 2100.2 was amended to refer to "[e]ach person at the scene of *an emergency occasion.*" *Compare* D.C. Police Reg., art. 6, § 2 (a) (1981) (amending prior version), *with* 24 DCMR § 2100 (1983) (emphasis added). We have no indication that this alteration was intended to change the meaning of the regulation; instead it appears that the intent was to provide a clear referent for the "occasions" in § 2100.1 that define the regulation's scope. Moreover, reading "emergency occasion" this way makes practical sense: to be effective, the situational authority of the police to "afford[] a clearing" of thoroughfares under § 2100.1 must be coextensive with police power under § 2100.2 to demand compliance with orders issued to effect such clearings.[20] Thus, we conclude that "an emergency occasion" in § 2100.2 refers to "fires,

---

[20] By the same token, we see no indication that the situational authority of the police should be interpreted more broadly under § 2100.2 than under § 2100.1 to give the police the authority to issue crowd and traffic clearing orders in any event deemed by the police to be an "emergency." This would raise the specter of martial law powers, not to mention potential vagueness and overbreadth problems. *See Mack v. United States*, 6 A.3d 1224, 1233–34 (D.C. 2010) (courts must construe ambiguous language so as "to avoid serious constitutional doubts" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009))).

accidents, wrecks, explosions, parades, or other occasions [that] cause or may cause persons to collect" in specified public areas, under § 2100.1.[21]

Having clarified that "emergency occasion" refers to the opening clause of § 2100.1, we examine that language. It contains a subject, which consists of a list of situations ("fires, accidents, wrecks, explosions, parades") and a catchall ("other occasions"). It also includes a modifying verb phrase that identifies the consequential impact of the subject occasions: that they "cause or may cause persons to collect on the public streets, alleys, highways, or parkings." All of the occasions specifically enumerated in § 2100.1, "fires, accidents, wrecks, explosions, [and] parades," will presumptively have that impact; we assume that is why they are enumerated. The question then is what are the "other occasions" that "cause or may cause" people to collect in the public thoroughfares? The canon of

---

[21] We acknowledge that describing such occasions as "emergencies," as § 2100.2 does, might, at first blush, seem inapt. While "fires, accidents, wrecks, [and] explosions" qualify, "parades" are less obviously so categorized. As noted above, however, "emergency occasion" references the entire predicate clause of the regulation, including "cause or may cause persons to collect" in the public thoroughfares of the District ("public streets, alleys, highways, or parkings"). Thus, the occasions that trigger the regulation (including parades) are fittingly designated "emergenc[ies]" in the context of crowd and traffic control because of their sudden and unpredictable impact on transportation and public safety. *Cf. Cullinane*, 566 F.2d at 119 (noting that "the regulation deals only with extraordinary or emergency 'occasions' in which substantial factors of unpredictability exist").

*ejusdem generis* counsels that the meaning of a catchall term is informed by the list of words preceding it.[22] Accordingly, the catchall term "other occasions" incorporates the commonality of "fires, accidents, wrecks, explosions, [and] parades." Particularly when interpreted with the modifying verb phrase, these terms reference nonroutine incidents with elements of unpredictability and potential disturbance vis-à-vis transportation and public safety. *See supra* note 22.

Turning to the facts of this case, we must consider whether the police were confronted with "an emergency occasion," and because the construction of a barn-like structure is not one of the enumerated occasions in § 2100.1, we examine whether it falls within the "other occasions" catchall. The assembly of the Occubarn, a 16 by 24 by 30 foot structure, in McPherson Square was clearly a nonroutine event with unpredictable consequences. Whether this spectacle created a potential disturbance such that it may have caused people to collect in public thoroughfares is a closer question. The government argues that the presence of the

---

[22] *See, e.g.*, *Paroline v. United States*, 134 S. Ct. 1710, 1721 (2014) ("[I]t is . . . a familiar canon of statutory construction that [catchall] clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated.") (second alteration in original); *Markowitz v. United States*, 598 A.2d 398, 408 (D.C. 1991) (holding that the catchall term "other activities" in a police regulation defining "demonstration activity" must "refer[] to actions in the same class" as the preceding list of words, so as "not [to] broaden the definition to include activities of every type").

Occubarn was a spectacle that drew a "very noisy and kind of chaotic" crowd and that, "absent police activity, an even larger crowd may have gathered and spilled into the streets." The protesters argue that it is unreasonable to think that a crowd of "a couple hundred people would have spilled over into the streets," particularly given that McPherson Square is so large that special events do not require a permit unless attendance exceeds five hundred people.[23] The flaw in the protesters' analysis, however, is that the regulation does not require the police to have predictive powers and assess with any particular probability that an event will cause people to collect in the public thoroughfares. Assuming other aspects of the regulation are complied with, it allows police to act prophylactically and broadly defines an emergency occasion as certain events that *may* cause people to collect in the public thoroughfares. With this construction, we conclude that the police were confronted with an emergency occasion.

We next consider whether the order to clear the area of the Occubarn was "necessary" under the Crowd and Traffic Control regulation. Like "emergency occasion," "necessary order" in § 2100.2 references specific language in § 2100.1. *Cullinane*, 566 F.2d 118 (holding that "[t]he word 'necessary' in this sentence of the regulation," now § 2100.2, "has the same meaning that it does in the preceding

---

[23] *See supra* note 4.

sentence," now § 2100.1). Section 2100.1 gives the police a particular tool to use in emergency occasions: "an officer . . . may establish an area or zone that he or she considers necessary for the purpose of affording a clearing for" the regulation's listed objectives. For two reasons, we conclude that the order to vacate the Occubarn was not a "necessary order" under § 2100.2.

To begin with, an order can only be "necessary for the purpose of affording a clearing" if it clears the areas that actually need clearing: the specifically identified areas in which people may "collect," i.e., "public streets, alleys, highways or parkings." The *expressio unius* canon "informs us that when a list is enumerated it may be presumed to be exhaustive unless otherwise provided," as, for example, through clear evidence of legislative intent. *District of Columbia v. Brookstowne Cmty. Dev. Co.*, 987 A.2d 442, 447–48 (D.C. 2010). We lack any evidence suggesting that the list is not exhaustive or that the Crowd and Traffic Control regulation was meant to apply to public parks.[24] Indeed, although iterations of this regulation have been in place for decades, we are aware of no

---

[24] Because we conclude that the regulation does not apply to parks, we need not address whether it applies to federal parks in particular or whether the U.S. Park Police can rely on this regulation to make arrests on federal property. *See* D.C. Code § 5-207 (2013 Repl.) (authorizing park police to make arrests on federal property for violations of federal laws and regulations); § 5-201 (giving the park police "the same powers and duties" as the Metropolitan Police Department in the District of Columbia).

court decision examining, much less upholding, the application of this regulation to parks.[25]

Our disinclination to read this regulation to extend to parks is further buttressed by the fact that parks are traditional fora for the exercise of First Amendment activity. *See, e.g.*, *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) (noting that parks, as well as streets, "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions"). Such activity is protected both by the First Amendment to the U.S. Constitution and by local statute.[26] Given this protected status, we are confident

---

[25] In the seven demonstrations at issue in *Cullinane*, the police used the Crowd and Traffic Control regulation to disperse large groups of people that "block[ed] traffic," filled "heavily-travelled thoroughfares" from "building line to building line," or otherwise attempted "to block access to the city." 566 F.2d at 112–15. Similarly, in *Streit*, 26 A.3d at 316, the defendants were demonstrating on the sidewalk in front of the White House, not in a park. Although sidewalks are not included in the thoroughfares listed in § 2100.1, they are generally considered to be part of the streets. *See, e.g.*, *Alvarez v. United States*, 576 A.2d 713, 715 (D.C. 1990) (citing various authorities for the proposition that "[t]he 'street' includes both the roadway and the sidewalk"). In any event, *Streit* did not foreclose a challenge to the application of the Crowd and Traffic Control regulation outside public thoroughfares because it did not address the issue.

[26] D.C. Code § 5-331.03 (2013 Repl.) (recognizing that the "right to organize and participate in peaceful First Amendment assemblies" is "subject [only] to reasonable restrictions designed to protect public safety, persons and property, and to accommodate the interest of persons not participating in the

(continued…)

that if the Crowd and Traffic Control regulation were intended to authorize the police to clear public parks, it would say so explicitly, as it does with public streets. *Cf. Alvarez v. United States*, 576 A.2d 713, 715–16 (D.C. 1990) (explaining that the Council meant to prohibit the possession of open containers of alcohol in all public spaces where the statute prohibited such possession on "any street, alley, *park* or parking") (emphasis added). As the police had no authority under § 2100.1 to clear an area inside McPherson Square, they did not issue a "necessary order" under § 2100.2.

In addition to being limited to clearing thoroughfares, a "necessary order" under § 2100.2 must be issued to advance one of the enumerated objectives of § 2100.1: "(a) [t]he operation of firemen or policemen; (b) [t]he passage of a parade; (c) [t]he movement of traffic; (d) [t]he exclusion of the public from the vicinity of a riot, disorderly gathering, accident, wreck, explosion or other

---

(…continued)
assemblies . . . to use the parks for recreational purposes"); § 5-331.08 (prohibiting the police from establishing an "emergency area or zone . . . by using a police line to encircle, or substantially encircle, a demonstration, rally, parade, march, picket line, or other similar assembly (or subpart thereof) conducted for the purpose of persons expressing their political, social, or religious views," except in limited circumstances "where there is probable cause to believe that a significant number or percentage of the persons located in the area or zone have committed unlawful acts (other than failure to have an approved assembly plan) and the police have the ability to identify those individuals and have decided to arrest them").

emergency; [or] (e) [t]he protection of persons and property." § 2100.1 (a)–(e). On appeal, as at trial, the District argues that the police were acting to protect persons and property. But while the police are authorized to issue clearing orders they "consider necessary" for the enumerated purposes, those purposes may not be entirely hypothetical or conjectural. The police may not clear an area they consider necessary for the "passage of a parade" when there is no parade, or for the "exclusion of the public from the vicinity of a riot" when there is no riot. *See* §§ 2100.1(b), (d). And the police may not clear an area they consider necessary for the "protection of persons and property" without demonstrating that persons or property are in possible danger and thus in need of special protection.[27]

The District does not dispute this; it argues, however, that it proved that the police had reason to believe persons and property were in actual danger because there was evidence that that the unpermitted Occubarn might collapse and hurt both the protesters and any bystanders.

---

[27] Without such a limitation, the police would have largely unconstrained authority to issue crowd and traffic clearing orders: Having discerned an emergency occasion (which, as discussed above, requires only some possibility that people may gather in public thoroughfares) and invoking their ever-present general obligation to promote public safety, they could issue clearing orders simply because empty streets are safe streets.

Preliminarily, regardless of whether the police had reasonable grounds to believe that the Occubarn was unsafe, this safety concern was unrelated to clearing the adjoining thoroughfares. The regulation designed to clear the thoroughfares does not give the police carte blanche to address any perceived public safety concern unrelated to that fundamental purpose. However much other statutes or regulations, present or future, may bear upon police power to act in such a situation, it would warp the language of the particular regulation to uphold appellants' convictions thereunder.

But even as to the safety concerns asserted by the District, the record fails to support the conclusion that the police reasonably believed that the Occubarn was a safety hazard. The magistrate judge found that when Lieutenant Lachance issued his order to vacate the Occubarn on the evening of December 4, 2011, "he had no idea about its [st]ability," but he "did not think" it presented an "immediate danger." Moreover, by the time Lieutenant Lachance issued his order, the structure had been in place all day and the police had had full access to it. The District presented no evidence that anyone discerned any structural defect in the Occubarn during this time. The DCRA building inspector who was summoned to inspect the structure testified that the structure showed no signs of instability. And he only determined that the structure should be posted as unsafe because it

appeared to be unpermitted, in violation of District of Columbia building regulations that have no application on federal land. This fact prompted the magistrate judge to conclude that the danger signs he affixed had little "force" under the circumstances. As a further indication that the protesters were not in any actual danger, the police asked the inspector to delay posting the structure for hours, until they conducted more "crowd control activities." Indeed, the District effectively conceded this issue at trial by arguing in closing: "This is not a case about the structural integrity of [the Occubarn]."

In sum, while the District established that the police were confronted by an emergency occasion, it failed to prove beyond a reasonable doubt that the protesters disobeyed a "necessary order." The District failed to present sufficient evidence both that the order was necessary to "afford[] a clearing" in the areas the police were authorized to clear and that the order was necessary to achieve one of the objectives of the Crowd and Traffic Control regulation, namely the protection of persons and property. This is not to say that the police had no power to address what appears to have been their goal—not crowd or traffic control, but getting rid of the Occubarn. It is only to say that they could not do so under the auspices of 24 DCMR § 2100.2. Accordingly, we conclude that the protesters' convictions for failing to obey an order issued under § 2100.2 must be reversed.

## B. Mr. Givens's Indecent Exposure Conviction

The only remaining issue to address is Mr. Givens's overbreadth challenge to the indecent exposure statute, which in relevant part makes it "unlawful for a person, in public, to make an obscene or indecent exposure of his or her genitalia or anus."[28] D.C. Code § 22-1312. Mr. Givens argues that this provision is unconstitutionally overbroad because it facially prohibits "indecent"—not just "obscene"—exposure and thus covers some theatrical and artistic displays of nudity that are protected by the First Amendment.[29] *See Reno v. ACLU*, 521 U.S. 844, 874 (1997) ("In evaluating the free speech rights of adults, we have made it perfectly clear that '[s]exual expression which is indecent but not obscene is protected by the First Amendment.'" (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989))). "Facial overbreadth claims have . . . been

---

[28] As Mr. Givens's challenge is directed only to the portion of the statute under which he was convicted, we do not address its other provisions.

[29] The District argues that Mr. Givens lacks standing to raise an overbreadth challenge because the statute does not implicate the First Amendment and our exception to prudential third-party standing rules only applies "in limited circumstances." *Gamble v. United States*, 30 A.3d 161, 166 (D.C. 2011). Although "the absence of First Amendment concerns renders an overbreadth claim non-justiciable under notions of prudential third party standing," *McNeely v. United States*, 874 A.2d 371, 381 (D.C. 2005), the indecent exposure statute facially prohibits some expressive conduct, thereby implicating the First Amendment and affording Mr. Givens standing to raise this challenge. *See Broadrick v. Oklahoma*, 413 U.S. 601, 611–12 (1973).

entertained where statutes, by their terms, purport to regulate . . . expressive or communicative conduct." *Broadrick v. Oklahoma*, 413 U.S. 601, 612–13 (1973). Although we agree that the challenged provision of § 22-1312 could be interpreted to cover some forms of expressive conduct and thus implicates the First Amendment, this fact is not dispositive of the constitutional inquiry. Rather, "the overbreadth of [the] statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615.

Examining the reach of the challenged provision, we observe that it applies to a wide range of nonexpressive conduct, which is not protected by the First Amendment. *See, e.g.*, *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (noting that "[b]eing in a state of nudity is not an inherently expressive condition"). At the same time, certain kinds of expressive conduct that fall within the facial reach of the statute are affirmatively authorized elsewhere in the District's Code. *See* D.C. Code § 25-372 (2013 Repl.) (permitting expressive nudity in certain establishments licensed to sell alcohol).[30]

---

[30] To the extent that two statutes conflict, "the more specific statute governs the more general one." *District of Columbia v. Gould*, 852 A.2d 50, 55 (D.C. 2004).

Even as to expressive nudity, the provision's imposition on First Amendment rights is limited. It applies only "in public," a phrase that the legislative history defines as "in open view; before the people at large," D.C. Council, Report on Bill 18-425 at 7 (Nov. 19, 2010). Thus, the challenged provision does not encompass a number of the settings cited by Mr. Givens, for example, an in-studio display of nudity for a painting class or an indoor theatrical performance that requires the purchase of a ticket. Instead, the revised statute confines this provision's reach to settings wherein expressive nudity can be constitutionally regulated because minors might be present or nonconsenting adults are not easily shielded from displays of nudity.[31] *Cf. Parnigoni v. District of Columbia*, 933 A.2d 823 (D.C. 2007) (upholding, under an earlier form of § 22-1312 that lacked an express "in public" element, a conviction for conduct that

---

[31] Mr. Givens argues that the Supreme Court has "held that the sexual expression of adults that is 'indecent' but not 'obscene' is constitutionally protected." But although courts have been willing to protect the rights of consenting adults to transmit and receive indecent materials, they have also permitted states to regulate the dissemination of some indecent materials to minors and nonconsenting adults. *See Ginsberg v. New York*, 390 U.S. 629, 636 (1968) ("[M]aterial which is protected for distribution to adults is not necessarily constitutionally protected from restriction upon its dissemination to children. In other words, the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed or from whom it is quarantined."); *see also Reno*, 521 U.S. at 875 (acknowledging that the Supreme Court has "repeatedly recognized the governmental interest in protecting children from harmful materials" but qualifying that "that interest does not justify an unnecessarily broad suppression of speech addressed to adults" via the internet).

occurred in a private home). Moreover, the challenged provision does not prohibit all nudity in public. It prohibits the exposure only of one's genitals or anus, thereby directing the prohibition at certain kinds of nudity that tend to be sexually evocative even if not "obscene." *See Miller v. California*, 413 U.S. 15, 24, 27 (1973) (defining obscene materials as "works which depict or describe [hard core] sexual conduct, . . . appeal to the prurient interest," and lack "serious literary, artistic, political, or scientific value").

On the whole, the reach of the indecent exposure provision into constitutionally protected territory is limited and thus not "substantial . . . in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. Accordingly, we conclude that the indecent exposure statute is not substantially overbroad. To the extent that constitutionally protected conduct is prosecuted under § 22-1312, plaintiffs can follow the "traditional rules of practice," *Broadrick*, 413 U.S. at 615, by bringing as-applied challenges that seek to invalidate applications of the statute to their particular expressive conduct. Mr. Givens does not challenge the indecent exposure statute as applied, nor does he challenge the sufficiency of the evidence used to convict him. Thus we affirm his conviction for indecent exposure.

### III. Conclusion

For the reasons set forth above, we reverse the protesters' convictions under the Crowd and Traffic Control regulation, and affirm Mr. Givens's conviction for indecent exposure.

*So ordered*.

STEADMAN, *Senior Judge*, concurring in the judgment: I agree with the majority that the evidence does not establish the necessary nexus between the cordoning off of the Occubarn for safety reasons and crowd control on the public thoroughfares. To my mind, this alone is sufficient to dispose of the appeal in favor of the appellants charged under §2100.2. I go no further in that analysis.